1        UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

SYLVIA JACKSON and            )
4  GEORGE JACKSON, JR.,          )  Case No. 5:22-cv-4380-PCP
                                 )
5              Plaintiffs,   )  February 20, 2025
      vs.                        )
6                                )  Motion Hearing
TESLA, INC., et al.,          )
7                                )
              Defendants.   )
8  _____)

9

10        REPORTER'S TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE P. CASEY PITTS
11            UNITED STATES DISTRICT JUDGE

12             PAGES 1 - 55

13

APPEARANCES:
14

FOR PLAINTIFF:        WALKUP, MELODIA, KELLY & SCHOENBERGER
15                     650 California Street, 26th Floor
                       San Francisco, California  94108
16                     By: Andrew P. McDevitt, Esq.

17

FOR DEFENDANT:        DYKEMA GOSSETT, LLP
18                     444 S. FLower Street, Suite 2200
                       Los Angeles, California  90071
19                     By: James S. Azadian, Esq.

20

21  REPORTED REMOTELY BY:

22  ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
    U.S. OFFICIAL COURT REPORTER
23  U.S. District Court Clerk's Office
    333 West Broadway, Suite 420
24  San Diego, California  92101

25  Reported stenographically; transcribed with CAT software.

1    ***THURSDAY, FEBRUARY 20, 2025, 10:00 A.M.***

2              ***

3       **THE CLERK:**  Calling Case No. 22-cv-4380, *Jackson, et*

4    *al., vs. Tesla, Inc.,* on today for the motion to transfer to the

5    District of Maryland and the motion to apply Maryland products

6    liability law.

7       Will the parties please approach the podiums and state

8    your appearances for the record, beginning with Plaintiff's

9    counsel.

10       **MR. McDEVITT:**  Good morning, Your Honor.  This is

11    Andrew McDevitt for Plaintiffs.

12       **THE COURT:**  Good morning.

13       **MR. AZADIAN:**  Good morning, Your Honor.  My name is

14    James Azadian, and I represent Defendant Tesla.

15       **THE COURT:**  Okay.  Good morning.  So we are here on

16    Tesla's motions.  There are three motions that have been filed,

17    as I noted on the docket.  I'm going to take the motion to

18    recuse under submission and I'll issue a written order on that.

19    I want to focus today on the motion to transfer and the motion

20    to apply Maryland products law.  And those are Tesla's motions,

21    so I'll start by hearing from Tesla.

22       Let's start kind of in logical order.  Obviously, I

23    need to decide the recusal issue first, and then probably the

24    transfer issue, and then the rest, so let's start with the

25    motion to transfer.

1    **MR. AZADIAN:**  Thank you, Your Honor.  And we agree with

2    that order in the prioritization of the motions.

3        I want to start off with the important point that

4    Plaintiffs do not dispute that Maryland is the more convenient

5    forum here.  Plaintiffs can see that they could have filed this

6    case in Maryland.  Nowhere in the papers do Plaintiffs dispute

7    that it will be far more convenient for both the parties, and in

8    my opinion, more importantly, the witnesses to have this case

9    proceed in Maryland.

10        This Court has not been issued any substantive rulings

11   or even decided which state's law applies to the case.  Tesla

12   brings this motion before any pretrial motion has been heard and

13   before there has been even a substantive appearance before an

14   Article III judge.  There can be no prejudice posed by Tesla

15   bringing this now well-supported motion.

16        Maryland is the home state.  And Plaintiffs both reside

17   there.  Of course, third party and key witness Ms. Sosa, who hit

18   Mrs. Jackson, and who law enforcement pursued criminal charges

19   against, also resides in Maryland.  All of Mrs. Jackson's

20   treating physicians reside there.  All law enforcement resides

21   there.

22   **THE COURT:**  Let me ask you a question on that front

23   because I was trying to piece this together.  I mean, it seems

24   like, from what I can tell in the briefing, it seems that

25   Tesla's argument, as I understand it, or it seems to be that the

1    pedal was depressed to a hundred percent overriding the safety

2    features.  Is that right?

3              **MR. AZADIAN:**  That is correct, Your Honor.

4              **THE COURT:**  Okay.  So is that disputed?

5              **MR. McDEVITT:**  No, Your Honor.  It's a little bit more

6    nuanced, but essentially, no.

7              **THE COURT:**  Okay.  So, I mean, if that is the case,

8    why -- what is going to be the relevance of testimony from the

9    driver, testimony from police officers, anything along those

10   lines?  I mean, what -- how does -- if the actual facts of what

11   happened are, at their core, going to be undisputed, then the

12   question is really a question of products liability law, why

13   does -- why are these witnesses going to be needed or relevant

14   to have any relevance to the litigation in this matter.

15             **MR. AZADIAN:**  Well, two things, Your Honor.  One is I

16   think it's much more nuanced than that.  I think that the jury

17   does need to -- it's not just simply is it disputed or is it

18   undisputed that Ms. Sosa pushed the accelerator a hundred

19   percent, as recorded by the computer module.  It's what

20   liability and allocation of fault comes to her through that.

21   That will be disputed.  And that has been disputed throughout

22   the papers so far that we have seen, and in the discovery and

23   the depositions that have been taken thus far.

24             We have not been able to even depose Ms. Sosa because,

25   of course, she is beyond the reach of a subpoena of this Court.

1    We couldn't even be able to call her in for a trial in this case

2    because it's beyond the hundred-mile reach.  In fact, even the

3    Ninth Circuit in 2023 *In re Kirkland* says that remote testimony

4    is not appropriate where the witness is beyond the 100-mile

5    geographic reach of the home court.

6         And so effectually --

7         **THE COURT:**  So yeah, just to explain those nuances to

8    me, though, I mean, how is the theory -- is there a dispute

9    about it was too easy to get to a hundred percent?  Where does

10   this come in as a legal matter?

11        **MR. AZADIAN:**  Well, I think it does -- I think

12   that's -- part of the theory.  I mean, of course, we know the

13   Plaintiff's theories at this point, Your Honor.  There is no way

14   for us to mind read and know.

15        **THE COURT:**  Well, presumably you could have done some

16   contention interrogatories or something along those lines, or

17   depositions.

18        **MR. AZADIAN:**  And we did, which is why I'm saying that

19   it's pretty nuanced.  But even right now, we don't have any, you

20   know, roadmap of these are the claims and these are the theories

21   and these are the arguments that are going to be put before the

22   jury.

23        The second thing is that when it comes to the -- to

24   Ms. Sosa herself -- excuse me.  When it comes to the other

25   witnesses, we're talking about damages.  We're talking about

1   injuries.  We're talking about treatment of this Plaintiff.  All

2   of those physicians are located in Maryland.

3          And so that is very much hotly disputed and contested,

4   and the jury will need to hear from those treating physicians.

5   And so it's not just simply Ms. Sosa that we're talking about.

6   You know, we're also talking about Ms. Sosa's husband, you know,

7   who purchased this vehicle -- this vehicle.  There is some

8   suggestion on the part of Plaintiffs that somehow that testimony

9   might become relevant, depending on what is argued.

10         But aside from the third parties, Your Honor, I also

11  just want to say that the first responders here are also -- it's

12  also very relevant as to what they found at the scene, and what

13  they were reported to have learned by Ms. Jackson at the time of

14  the injury and when they arrived.  They, of course, pursued

15  criminal charges against Ms. Sosa, the third party here, who has

16  not been named in this case.

17         Plaintiff's opposition does not even identify one

18  California witness who will present testimony at this trial,

19  contrasted to the fact that every single witness on their list

20  is going to be from Maryland.

21         The prejudice to Tesla, Your Honor, is extreme.  This

22  Court cannot compel nonparty Maryland witnesses to attend under

23  Rule 45 (c)(1), because of that hundred-mile limitation.  *In re*

24  *Kirkland* closes the door to remote testimony in terms of

25  compelling that testimony.  We could certainly get into some

1   kind of agreements with folks to see if they could come.

2          But at the end of the day, those can't be enforced.

3   You know, certainly, Zoom -- a Zoom last minute doesn't work.

4   Juries are waiting.  It just doesn't seem to make sense,

5   especially when the plaintiffs both reside in Maryland.

6          **THE COURT:**  Right.  I mean, let me say the -- you would

7   have a very strong motion, you know, had it been filed shortly

8   after this case management conference, as there was a discussion

9   at the initial case management conference.

10          And certainly all of the arguments about these

11  witnesses were -- were available.  And that -- you know, the

12  issues with the subpoena power, the issues about -- these are

13  all issues that were present as soon as this case was -- you

14  know, as soon as this case was removed to this Court, certainly

15  upon the time of its filing.  But as soon as it was removed, you

16  could have filed a motion, the same motion to transfer.

17          And so I understand there's an argument that there were

18  California witnesses named in the initial disclosures.  So --

19  but that said, to the extent this is really relying on, you

20  know, that you have the same problems even if, you know,

21  those -- even if they had deposed some number of those

22  California witnesses in this case; right?

23          **MR. AZADIAN:**  No, Your Honor.  I don't think that's

24  right at all, respectfully.  As of November 17th, 2022, initial

25  case management conference before Judge Friedman, Tesla's

1    counsel advised Judge Friedman that he needed to review the

2    then-currently filed -- excuse me -- currently served

3    Rule 20 6(a)(1) disclosures to see if a transfer motion could be

4    brought.

5            In those initial disclosures, Your Honor, 22 California

6    Tesla employees, plus additional numerous unnamed current and

7    former Tesla employees in California, were named.  And because

8    Tesla was led to believe at that time that Plaintiffs would take

9    all those depositions --

10           **THE COURT:**  I guess my point is that to the extent --

11   the problems with getting testimony from Maryland witnesses were

12   present at that time; correct?

13           **MR. AZADIAN:**  No -- oh, on that question, no.  Well,

14   Your Honor, not with respect to Ms. Sosa.  Because remember, we

15   were still at the point of determining whether we're going to

16   add parties or not at that time.

17           **THE COURT:**  Okay.

18           **MR. AZADIAN:**  And so it was unclear.  And really we

19   were --

20           **THE COURT:**  But all of the other witnesses, you know,

21   you were situated the same in terms of the Court's power to

22   subpoena their testimony in 2022 as we are sitting here today;

23   correct?

24           **MR. AZADIAN:**  Yes, Your Honor.  But, again, the

25   landscape was very different under *forum non conveniens*

1  analysis.  Because when you have dozens and dozens and dozens of

2  witnesses named in those initial disclosures, at the time of

3  that case management conference, it would be -- it would be

4  inappropriate.

5       **THE COURT:**  I mean, I'm not, you know, you could -- you

6  could see that and say, Look, if they're employees of a party,

7  in fact, you know, you might have a very good motion at that

8  time to say, There are these witnesses that are outside the

9  Court's subpoena power.

10      If you transfer this case to the District of Maryland,

11 you will -- we can still compel those named individuals to

12 appear for deposition and appear for parties, because they're

13 employees of one of the parties to the case; right?  I mean, you

14 could have -- if you're thinking at that point about which court

15 would have the most power to do -- to sort of bring these

16 witnesses in, it would have been even then, as soon as you got

17 that list, it still seems like it would have been the District

18 of Maryland.

19      **MR. AZADIAN:**  Your Honor, I think if you were to look

20 at it in isolation, just with respect to the witnesses that, you

21 know, we knew about in Maryland, but then again, you have to

22 contrast it to how many witnesses are in California and what is

23 the convenience to those witnesses and to the parties.

24      And so I -- I have to respectfully disagree.  I don't

25 think that we had, at that time, a very strong motion.  In fact,

1    I would argue that we had a pretty weak motion.

2           **THE COURT:**  And when did this -- when did -- when did

3    discovery in this matter close?

4           **MR. AZADIAN:**  It ended in the summer.  It ended in the

5    summer of 2024.

6           **THE COURT:**  Okay.  And you filed this motion in

7    December or January?

8           **MR. AZADIAN:**  Correct, Your Honor.

9           **THE COURT:**  Okay.  So there was another six months,

10   some period, you know, several-month delay between the close of

11   discovery and presumably, you know, 30 days before the close of

12   discovery, you were aware of who they were going to depose,

13   given the notice requirements.

14          **MR. AZADIAN:**  Yes, Your Honor.  And I agree with you

15   that there were a few months there from the close of discovery.

16   But we did need to have that fact discovery closed in order for

17   us to be able to ascertain for a fact that, Okay, now the bluff

18   is up.

19          **THE COURT:**  All right.

20          **MR. AZADIAN:**  There are aren't all these witnesses in

21   California.  In fact, there are none in California, while

22   they're all in Maryland.  And that's the extreme prejudice that

23   we face.  Because if we are not able to call these witnesses, we

24   are basically not able to defend this case.

25          And that is why the subpoena reach of the Maryland

1    District Court is so critical to this case.  And, Your Honor,

2    there is no gamesmanship here.  I can assure you, there's no

3    gamesmanship here.

4         What we're talking about is Tesla, this whole time,

5    believed that Plaintiffs would take those depositions in

6    California.  It had no reason to distrust or disbelieve

7    Plaintiff's counsel on that.  And that they would be called

8    to --

9         **THE COURT:**  And did you ask -- did you -- over the

10   course of discovery, did you make inquiries of Plaintiffs about

11   their intentions with respect to these witnesses?

12        **MR. AZADIAN:**  Yes, through correspondence.

13        **THE COURT:**  Okay.  Is that before me?

14        **MR. AZADIAN:**  I don't know that it is, Your Honor.

15        **MR. McDEVITT:**  And I'm not really sure how Counsel can

16   attest to that.  This is the first interaction I've had with

17   this attorney in the case.  He has not been involved in the

18   discovery.

19        **MR. AZADIAN:**  That's correct.  When I say "counsel,"

20   I'm, of course, talking about my colleagues at the Nelson

21   Mullins firm, Your Honor.

22        **THE COURT:**  Okay.  And what were those inquiries?

23        **MR. AZADIAN:**  Emails and phone conversations.

24   That's -- that's all I have.  I don't have any material before

25   me.  I can certainly produce it in a supplemental brief.

1      **THE COURT:**  Okay.  I mean, you know, this motion is

2   late.  And I think it's clear, you know, for these reasons, it

3   could have been filed shortly after -- I understand your

4   argument.  There could have been a discussion at some point, you

5   know, before the close of discovery when it seemed like

6   Plaintiffs were not moving forward with these witnesses.

7      I mean, I don't know that I necessarily think of the

8   Plaintiffs' strategy as a strategy of gamesmanship.  I mean,

9   they don't know -- they don't know Tesla, they don't know how

10  Tesla works, so they probably need to figure out who the

11  relevant witnesses are and who they need to talk to.

12      I can understand at the outset, and especially in

13  initial disclosures, they're just kind of throwing darts at a

14  board hoping that these are the people that they might need, so

15  I'm not sure I see gamesmanship on that front.

16      And I am concerned about the several-month delay

17  between it being clear that none of these people were going to

18  be deposed, that they aren't going to be witnesses in this

19  matter -- they theoretically could still be witnesses, but they

20  weren't going to be deposed -- and the filing of the motion,

21  when, you know, there are real concerns about further delay and

22  trial of this matter.

23      And I mean, I think, you know, Plaintiffs have

24  suggested, and it seems reasonable to conclude that the earliest

25  that a trial in the District of Maryland might get set would be

1    somewhere in the middle of 2026, whereas if it stays here, you

2    know, I have the power to make sure -- I will say the current

3    trial date, I have another conflicting matter that day, so we're

4    going to have a trial setting conference instead of the pretrial

5    conference.  I think I've already converted that.

6          But I have the power to make sure that we get this

7    tried in the next few months, or we get this tried before the

8    end of summer, or certainly in 2025.  And that's the power I

9    have if it stays here.  And so I'm just not sure that the delay

10   alone is not a basis for denying the motion to transfer at this

11   point.

12         **MR. AZADIAN:**  Yes, sir.  The District of Maryland --

13   well, the speculative arguments that the District of Maryland

14   somehow is not going to be able to hear this case in the time

15   that's interfering is of this Court's own understanding of when

16   it can hear the case, it's entirely speculative.

17         What we have put before the Court, however, is data

18   that the District of Maryland is less congested than the

19   Northern District of California.  That, according to the --

20         **THE COURT:**  Right.  That's all from the point of

21   filing, like, trial, which doesn't say much of anything about

22   whether this case could get on trial in six months, and if any

23   judge would have space to do that.  It is also the case that,

24   you know, it's judicially noticeable that the criminal docket in

25   the District of Maryland represents a higher percentage of cases

1    in the District of Maryland than it does in our court.  And that

2    is an important factor in thinking about trial setting, because

3    criminal matters -- criminal trials always take precedent over

4    all of the rest of our docket.

5          So I don't -- I think it is a reasonable conclusion to

6    say that Plaintiff's estimate is -- you know, they spoke to

7    people who are knowledgeable about how the courts are operating,

8    and that seems reasonable to me.

9          **MR. AZADIAN:**  Okay.  What I also just want to do, then,

10   is just conclude that it would be manifestly more convenient for

11   both the parties and witnesses.  It would be extremely

12   prejudicial to my client not to be able to have the Court's

13   power to compel the testimony of these witnesses that are only

14   in Maryland.

15         **THE COURT:**  Let me ask you one final question before I

16   give the Plaintiff an opportunity to respond.

17         Is -- would Tesla be willing to -- and it's its own

18   choice, but one factor that could be relevant in timing is

19   whether the case could be assigned to a magistrate judge for

20   trial.  You know, that can only happen by consent.  But that --

21   if the parties were to consent to a magistrate judge's

22   jurisdiction, that would certainly create a potential for a

23   faster outcome, you know, either here or certainly in the

24   District of Maryland.

25         Is that something that Tesla has contemplated?

1          **MR. AZADIAN:**  I can certainly call my client,

2    Your Honor.  If the Court would like to recess, I can certainly

3    make that call.

4          **THE COURT:**  You don't need to do that right now.  You

5    all have total right to say no to that, so I don't want to be

6    pressuring anybody.

7          **MR. AZADIAN:**  Well, I believe as counsel, I can look

8    into it.  Obviously, it's a substantive decision that the client

9    would have to make.

10          **THE COURT:**  Okay.  Let me hear from Plaintiffs.

11          **MR. McDEVITT:**  So, Your Honor, there's a number of

12    things that I would like to just correct that are just not

13    accurate.  Counsel indicated that it didn't have an opportunity

14    to depose the driver or the driver's husband, and that's not

15    true.  They actually did depose the driver.  They spent

16    five hours deposing the driver.  And then deposed the husband.

17    So I'm not sure where that's coming from.

18          In the -- that they contend that they don't know

19    Plaintiffs' theories at this point is also manifestly untrue.

20    We've gone through expert discovery on both sides.  They know --

21    and, in fact, they have three motions pending that have been

22    filed relating to our expert testimony.  They know exactly what

23    the theories are.

24          The -- with respect to the damages being hotly

25    disputed, they're not.  I mean, there's no dispute that

1    Plaintiff's both legs were amputated above the knee.  There's no

2    contention that the care that she has received to date was

3    unnecessary or not reasonable.

4            To the extent that there is a dispute about future

5    medical treatment, they've disclosed an expert.  We've disclosed

6    an expert.  There's not a terrible amount of difference between

7    the two in terms of the opinions on what a person with a double

8    amputation is going to need for future treatment.

9            The -- with respect to the contention that the first

10   responders or witnesses to the incident are key or important in

11   this case, that's not true.  And the reason for that is because

12   of the uniqueness of the Tesla vehicles.  The Tesla that was

13   involved in the incident had eight cameras, so virtually

14   every -- every single view that you could see, and it recorded

15   all the data from the vehicle.

16           There is no dispute in the case that there was a pedal

17   misapplication.  Tesla internally reviewed the video and the

18   data.  They labeled this as a pedal confusion incident.  Their

19   human factors expert concedes this was a pedal confusion

20   incident.  Plaintiffs position is this was a pedal confusion

21   incident.  And everything is caught on video and we have all the

22   data.

23           The disputes come down to the design of the collision

24   avoidance features.  Namely, there were three things, but

25   essentially they do the same thing.  There's automatic emergency

1    braking, pedal misapplication mitigation, and object aware

2    acceleration.

3            Those three features all rely on the video and the data

4    in the vehicle, and Plaintiffs' contention is that Tesla

5    advertised those features as being for the purpose of this exact

6    type of scenario, when there's a pedal misapplication and

7    there's a person or vehicle in front of the Tesla, the Tesla's

8    got videos online where they've said -- and they've got public

9    disclosures where they say, That's what the feature does, is if

10   someone misapplies a pedal, it will automatically brake.

11           So that's where -- the dispute focuses on why didn't

12   the technology brake.  And that's going to be driven by expert

13   testimony.

14           And with respect to the comment about the California

15   witnesses, Your Honor is correct that, to the extent they were

16   Tesla employees, doesn't matter where the case is venued, we

17   could depose them.  But there are -- Tesla has a -- I would say

18   abnormally high rate of employee turnover.

19           So there are a number of employees that were involved

20   in the design of the auto pilot features that are at issue in

21   this case that no longer work there, but they are California

22   residents, because the technology was designed in California.

23           So one that counsel did not mention that was deposed is

24   Mr. Andrej Karpathy.  He is the former head of the vision side

25   of the technology in the artificial intelligence.  And he was

1    deposed in this case.

2           Mr. Bolaswami [ph], he is -- he is still with Tesla,

3    but he's in California.  And there are a number of other people

4    that Plaintiff identified that are former employees that are in

5    California that would -- we've disclosed in discovery.  Just

6    because we didn't take the deposition doesn't mean we don't

7    intend to call them.  We have, in fact, in other matters,

8    deposed a number of them, so we didn't feel the need to do it

9    here.

10          And I think the Court seized on what I think is

11   probably the most important factor here, is that the delay in

12   bringing this issue to the Court does cause substantial

13   prejudice to Plaintiffs, who's got a double amputation and now

14   has a husband with cancer.  She needs to have her day in court

15   and have the issue -- the case addressed and decided by a jury.

16          And Tesla -- there's no reason Tesla couldn't have

17   filed this motion years ago, as Your Honor indicated.  And, in

18   fact, we know that it's not like Tesla doesn't know how to do

19   that.  They were recent -- this month, they were sued in Texas

20   on a patent dispute.  The first motion they filed was a motion

21   to transfer it to the Northern District.

22          So it's not as if Tesla doesn't know that that is a

23   tool.  And, in fact, they acknowledged that at the first case

24   management conference.  So I think Your Honor seizes on the

25   right points in that there is no excuse for the delay here.  And

1    it would not be in the interest of justice to transfer this case

2    to Maryland at this point.

3         **THE COURT:**  I'll give you another two minutes, and then

4    we'll turn to the next motion.

5         **MR. AZADIAN:**  Thank you, Your Honor.  The factual

6    theories that you just heard Plaintiffs' counsel mention, all of

7    those are hotly disputed by Tesla.  And even though that's the

8    case, according to him, that's not the case according to Tesla.

9    And so that's --

10        **THE COURT:**  And what is the case according to Tesla on

11   those issues?

12        **MR. AZADIAN:**  He said that there's pedal confusion.

13   That's not Tesla's perspective at all.  There was no pedal

14   confusion.

15        **THE COURT:**  That it was intentional?

16        **MR. AZADIAN:**  Yes, Your Honor, that it was, in fact,

17   reckless, as law enforcement -- as law enforcement in Maryland

18   pursued charges against this witness, this third-party witness,

19   criminal charges of recklessness.

20        **THE COURT:**  Which is different from intentional; right?

21        **MR. AZADIAN:**  Your Honor --

22        **THE COURT:**  So I guess that's -- recklessness is

23   somewhere between negligence and --

24        **MR. AZADIAN:**  The theorization of this Court and of all

25   counsel here to be able to know what that testimony would be.

1    And the jury is entitled to hear that and entitled to draw

2    credibility assessments from those witnesses.

3        **THE COURT:**  But if she was deposed, as it's

4    represented, and she's unavailable to testify, then you could

5    use that testimony; correct?

6        **MR. AZADIAN:**  I don't know the answer to that.

7        **THE COURT:**  I'm in the midst of trial right now, so I'm

8    pretty sure that you could use that deposition testimony.

9        **MR. AZADIAN:**  I'm not even talking about Ms. Sosa right

10   now.  I'm talking about law enforcement witnesses.

11       **THE COURT:**  Okay.

12       **MR. AZADIAN:**  And so, I mean, I think it would be a

13   terrible mistake to just focus on Ms. Sosa when we're talking

14   about treating physicians --

15       **THE COURT:**  Is there any reason to think the law

16   enforcement witnesses would not be cooperative?

17       **MR. AZADIAN:**  Your Honor, I can tell you that from my

18   experience, that law enforcement witnesses, unless they are

19   subpoenaed and they have -- the Court forces them to show up,

20   they're not going to show up.  So, you know, again, this is a

21   lot of mind reading, a lot of clairvoyance that is being

22   required here.  But I don't think that is the standard.  The

23   standard needs to be focused on the extreme prejudice that is

24   going to be faced by Tesla by having to defend a case without

25   having these witnesses present or the real threat of having

1    these witnesses present at trial.

2         I also want to mention that what he said about the
3    witnesses, about Tesla deponents, categorically not correct.
4    They deposed Tesla -- a Tesla nonexpert in California.  That
5    individual said, I don't know anything about the case.
6    Deposition is over.  Not being called to trial.  If he does,
7    we're going to bring a motion for undue delay and irrelevance.

8         Tesla's nonexpert corporate representative deposed --
9    was on a data-ply tool, the one that he mentioned, which is also
10   irrelevant to the claims asserted of strict product liability,
11   negligence, and loss of consortium.

12        The only other Tesla representative that he mentioned
13   to you, he failed to mention that that person lives in Spain.
14   And that person is closer to Maryland than to California.

15        And so, Your Honor, I don't see that --

16        **THE COURT:**  What about possibility that there are
17   people that they've deposed before and they didn't feel the need
18   to take their -- to redepose them in this matter, but that they
19   were disclosed as -- on their initial disclosures, they may be
20   called to testify at trial.

21        **MR. AZADIAN:**  I don't know that that would be
22   admissible, Your Honor.

23        **THE COURT:**  Why?

24        **MR. AZADIAN:**  I mean, I --

25        **THE COURT:**  They don't -- you don't have to depose

1    someone to call them as a witness.

2         **MR. AZADIAN:**  I haven't researched it, but I would say

3    that I would think that we'd be able to question their

4    credibility if they were to actually appear at trial.  If there

5    was something that occurred in another case -- in another case

6    that we are not a part of, I just don't know that we would be

7    able to, you know -- that we'd be able to present our case as to

8    that witness.

9         **THE COURT:**  I mean, if the witness was properly

10   disclosed -- if the witness wasn't disclosed, you'd have an

11   issue.  But if the witness was properly disclosed and you were

12   concerned about what they might say, it's your job to depose

13   them.  It's not -- it's not the Plaintiff's job to depose

14   everyone they think they might want to call at trial.  It's the

15   other -- that's why we have disclosures, is to provide the other

16   party.

17        **MR. AZADIAN:**  Are we talking about the California

18   witnesses right now?

19        **THE COURT:**  I think he said that there were other

20   California witnesses who have been deposed in other matters,

21   potentially involved -- I assume involving Tesla.  I'm not

22   certain.  And if that's the case --

23        **MR. McDEVITT:**  It wasn't involving Tesla, Your Honor.

24   It was -- the depositions were defended by his co-counsel.  And

25   as a matter of counsel, Tesla in-house counsel attends every

1  single deposition, so I'm not really sure what the --

2         ***THE COURT:***  The bigger point is it doesn't -- I guess

3  my point is they can call -- if they were disclosed, they can be

4  called at trial.

5         ***MR. AZADIAN:***  Okay.

6         ***THE COURT:***  There's nothing else that is similar -- you

7  know, they're plaintiffs on their witness list.  They don't have

8  to take a deposition of their own client in order to preserve

9  that client's ability to --

10        ***MR. AZADIAN:***  And those are party witnesses we're

11 talking about, not nonparty witnesses.  And as party witnesses,

12 they would be required to show up in Maryland, just as they

13 would in California.

14        ***THE COURT:***  But I guess the point -- I guess the point

15 is that, you know, the whole point here is that they disclosed

16 these witnesses but failed to depose them.  If I'm thinking

17 about the convenience of the witnesses, that's a step -- you

18 know, that doesn't even -- they can call these people if they

19 were properly disclosed.

20        The fact that they weren't deposed is not dispositive

21 as to whether they are or are not going to be part of the trial

22 in this case, which is one of the factors.  Not the only factor.

23 I take your point about the -- if they are party witnesses, they

24 are subject to subpoena -- they're subject to being called at

25 trial even without the subpoena power of this Court.

1          But is there a separate -- if we're just think being

2     who the witnesses may be, it's not necessarily the case that who

3     was deposed is dispositive.

4          **MR. AZADIAN:**  And we're talking theoretically,

5     Your Honor.  Sorry to interrupt.  Go ahead.

6          We're talking theoretically now.  And what I'm saying

7     is back when -- back when we were before Judge Friedman on an

8     initial case management conference back in November of 2022, all

9     of this was even more theoretical.  And so --

10         **THE COURT:**  I guess, but that's a double-edged sword

11    for you.  At the same time, again, if we think of it from the

12    perspective of these disclosed individuals are still potential

13    witnesses at trial because they were disclosed, that they

14    were -- whether they were deposed or not is not dispositive of

15    that.

16         So then we're thinking of this in some ways, and

17    exactly the same way we were thinking about it in 2022 when

18    Tesla chose not to file a motion because of the presence of

19    these California witnesses in the initial disclosures.  I mean,

20    I think that argument runs both ways, about whether this motion

21    should have been filed three years ago.

22         **MR. AZADIAN:**  I think the major difference, Your Honor,

23    is we were talking about Tesla party witnesses, which they would

24    be able to appear anywhere.

25         **THE COURT:**  Which is the point I made, that they -- you

1    could have made that conclusion the day after you got the

2    initial disclosures to the extent that, you know, any large

3    number of these people were Tesla employees.

4            **MR. AZADIAN:**  And that would weigh in on the -- on the

5    issue of convenience, which is why we didn't bring the motion.

6            **THE COURT:**  No, but your argument now about prejudice

7    would have been you could have made the argument.  We need to be

8    in Maryland because Maryland has the subpoena power over the

9    vast majority of the nonparty witnesses in this case, and the

10   other -- the California witnesses can be compelled to testify as

11   party witnesses.

12           **MR. AZADIAN:**  Your Honor, again, at that time, the time

13   to add parties had not expired.  And it was -- it was expected

14   that Ms. -- it was our reasonable expectation that Ms. Sosa

15   would be added.

16           **THE COURT:**  And then you chose not to file a

17   cross-claim; correct?

18           **MR. AZADIAN:**  That is correct.

19           **THE COURT:**  So that -- it's not, you know, that --

20   that's on both parties in some ways.  If you really felt -- if

21   you felt that Ms. Sosa is responsible for the conduct here,

22   presumably you'd have some kind of cross-claim against her.

23           **MR. AZADIAN:**  I don't think, Your Honor, that bars

24   still the argument of extreme prejudice to us, because I do

25   still think we are --

1    **THE COURT:**  I mean, just to the extent that you're

2    arguing about the sort of failure to add her as a party being a

3    factor in -- in the timing of the motion.  That was something

4    that was not entirely out of Tesla's own control.

5    **MR. McDEVITT:**  And, Your Honor, can I just add one

6    comment?  In that same case management conference where the

7    issue of the transfer was brought up, we were asked whether we

8    intended to add -- bring Ms. Sosa in.  We said, No.  And Tesla

9    said, We are considering cross-complaining against Ms. Sosa.  So

10   this is all within their control.  So it's not -- I don't know

11   where there would be any suspicion that we would be adding her

12   when we said explicitly we were not planning on doing it.

13   **THE COURT:**  Okay.  I'm going to take the motion under

14   submission.  I'll issue a -- if I deny the motion to recuse,

15   then I will address the motion to transfer in a written order as

16   well.

17           So let's turn to the choice of law argument, which is

18   also Tesla's motion.

19   **MR. AZADIAN:**  Yes, Your Honor.  So in the event that

20   the Court doesn't transfer the case, then, as the Court

21   mentions, pending before it is this motion to apply Maryland

22   law.

23   **THE COURT:**  Let me ask you sort of a core question I'm

24   struggling with on this motion.  Maryland -- with respect to

25   torts, Maryland applies the *lex loci* doctrine, correct?

1          **THE COURT REPORTER:**  I'm sorry, Your Honor, would you

2     repeat that, please?

3          **THE COURT:**  With respect to tort claims, Maryland

4     applies the *lex loci*, l-o-c-i, doctrine.

5          So as I understand that doctrine, that would mean that

6     if this accident occurred in the District of Columbia or in

7     Virginia, Alexandria, elsewhere in the beltway, the southern

8     side of the beltway rather than the northern side of the

9     beltway, then Maryland says, Apply Virginia Law, Apply D.C. law;

10    correct?

11         **MR. AZADIAN:**  Apply Virginia law, Apply D.C. law.  If

12    it happened over there --

13         **THE COURT:**  *(Nods head.)*

14         **MR. AZADIAN:**  -- not in Maryland, but somewhere else in

15    the Beltway?

16         **THE COURT:**  Mm-hmm.

17         **MR. AZADIAN:**  I think that's right, generally.

18         **THE COURT:**  Doesn't that suggest that Maryland has a

19    minimal interest in the application of its own particular law to

20    the circumstances of this case?  I mean, Maryland seems to say,

21    You know, we're going to just go with wherever things happen.

22    Let's apply that law.  That's a choice.  That's easy to apply

23    the choice of law rule.

24         But given that they haven't adopted the kind of

25    government interest analysis that applies in California, and in

some ways disclaims any effort to sort of assert an interest in

applying their law to particular tort claims, doesn't that --

doesn't that ultimately sort of suggest that really when we

think about what interest Maryland may have here, it's really

Maryland interests that are hypothetical?

MR. AZADIAN: I don't think so. And, Your Honor, I

don't think the parties have briefed this. But I will say that

I'm sure if we do study it, that we're going to see that this is

a nuance and it has something to do with the fact that people

are constantly moving around and living in the various

jurisdictions. Having lived in D.C. for eight years, I can tell

you I hopped around. I lived in --

THE COURT: No. I mean, Maryland does this. Maryland

does it if the accident happens in Arizona; right? I mean, it

doesn't matter where. It's not just a question of there.

MR. AZADIAN: Oh --

THE COURT: They always apply this rule. They've just

decided that is this the rule that they apply to torts.

MR. AZADIAN: My understanding of that doctrine is that

it is most often applied, and I have seen it applied in other

contexts in those Beltway scenarios.

I know that when I studied Maryland's application of

choice of law and the Federal District Court's application of

choice of law, it has found that Maryland does have interests in

public -- in product liability policy, and in applying its own

1    private product liability policy to actions that happen to its

2    residents in Maryland.

3            So I don't think I'd be prepared to say that Maryland

4    has somehow, you know, disbanded with its interests as a general

5    matter.  I just don't think that that's -- that's correct.

6            **THE COURT:**  I mean, where are the statements stating

7    clearly -- and particularly from the Maryland Courts, the

8    Maryland legislature, which is really what seems most important

9    here -- stating that Maryland has an interest in having its

10   products liability standards rather than those of another state

11   like California apply to circumstances?  Let's hear it.

12           **MR. AZADIAN:**  I don't think either side has provided

13   that, but we can certainly provide a supplemental brief.

14           **THE COURT:**  I know, but that's the argument.  You need

15   to establish that under the -- under the standard; right?

16           I mean if -- you know, you can't just -- you know,

17   presumably, you would brief -- your briefs would go beyond

18   stating just a -- stating -- taking a position in California has

19   no interest in this case, and then if you lose on that issue,

20   then it goes unaddressed.

21           I mean, the standard requires me to balance the

22   interests of California against the interests of Maryland;

23   right?

24           **MR. AZADIAN:**  It does, Your Honor.  But I also think

25   that nowhere in California law does it say that one -- one does

1    not presume that the other state doesn't have an interest.  That

2    is there a presumption that each state does have an interest,

3    Your Honor, that's relevant.

4            **THE COURT:**  I mean, I guess --

5        **MR. AZADIAN:**  And so I think to start with the

6    presumption that that state -- that it's an open question for

7    every state, I think I would say that would be the -- the, you

8    know, wrong path.

9            The first step, step one, that the California Courts

10   have reminded us time and time again, is whether Maryland law is

11   different from California law.  And the reason that's the first

12   step is because it presumes that both states do have an

13   interest.  Okay?  That's where it starts.  That is why --

14           And here in this case, both sides agree that no further

15   factual development is necessary for the Court to resolve the

16   choice of law issue.  Both sides also agree that Maryland

17   products liability law is different than California's.  And we

18   have provided five very specific and important examples of that.

19           **THE COURT:**  Right.  And I've gone through, and I think

20   I can figure out for myself whether I think you're right about

21   there being a material difference between the laws.  I think I'm

22   thinking about steps two and three of the analysis right now.

23           **MR. AZADIAN:**  Okay.

24           **THE COURT:**  And that's where, you know, we have to

25   think, is it a true conflict in the context of this case, and if

1    so, which state has greater interests.

2              *MR. AZADIAN:*  Right.

3              *THE COURT:*  And if -- and if we're at that step, if the

4    only thing we have is a presumption, as against California's

5    interest in -- you know, in regulating the conduct of

6    manufacturers that are -- and designers that are operating here

7    in the State of California, it seems a hard argument for you to

8    make if it's -- if we're weighing something that has been

9    recognized, not only in the --

10             I understand that the, you know, there's an argument

11   that the Cal Supreme Court case that is cited saying that

12   there's a *forum non conveniens* rather than a choice of law case.

13   But I actually think that the *Chen II* decision from the

14   California Court of Appeals would say -- support finding that

15   interest here.

16             I mean, in that case, the Court effectually said the

17   state where the manufacturer was located has an interest in

18   having its products liability laws applied to that

19   manufacturer's design decisions.  And that's what we're talking

20   about here.  I mean, so, you know, I know you rely on *Chen II*,

21   but --

22             *MR. AZADIAN:*  We rely on *Chen III*, Your Honor, because

23   *Chen II* was overruled.

24             *THE COURT:*  Right.  The final one, *Chen III*, where they

25   say it was proper to apply Indiana law because the manufacturer

1  was located in Indiana.

2          **MR. AZADIAN:**  That was -- that's part of it, yes.  And

3  so what happened, just to be very clear, the *Chen* -- there are

4  three *Chen* cases, right?  They're all one case.

5          **THE COURT:**  The decision on remand from the California

6  Supreme Court.

7          **MR. AZADIAN:**  Right.  And then what happened after that

8  was the Supreme Court, after that was appealed, the Supreme

9  Court denied review.  There was a petition for review and the

10 Supreme Court denied review.

11         But I do think it's important, if you'd allow me to

12 just walk you through *Chen*.  Because there, what happened was

13 plaintiffs sought a determination that Indiana law applied and

14 then the Trial Court agreed with them.  That's *Chen I*.

15         Things then changed, and the only remaining defendant,

16 there was one, was a California distributor.  That was the only

17 remaining defendant in the case at that point, because the

18 Indiana manufacturer settled out.

19         So plaintiffs versus a California distributor on that

20 side.  Plaintiffs then filed a motion *in limine* seeking

21 application of California law.  A newly assigned trial judge

22 denied that motion *in limine*.  The trial proceeded under Indiana

23 law, and the result was a 10-two defense verdict.

24         The plaintiffs then appealed.  The Court of Appeal,

25 which is *Chen II*, reversed, holding California law applied.

1   California Supreme Court then reversed the Court of Appeal.  And

2   on remand, the Court of Appeal reconsidered and decided Indiana

3   law applies.  That's *Chen III*.  California Supreme Court then

4   denied review.

5          Now, the reason why *Chen III* is so important is because

6   here, there is no true conflict of the state governmental

7   interest involved.  In *Chen III*, the California Court of Appeal

8   explained, and allow me to quote this relevant part:

9          "The policy behind imposing strict products liability

10         and the underlying basis for the policy is the

11         protection of California residents and other persons

12         within its territorial jurisdiction from injury.

13         California's interest in opposing that policy --

14         imposing that policy becomes hypothetical when the

15         injured persons are not California residents and were

16         not injured in California."

17         **THE COURT:**  So that's your theory is that they

18  recognized a right -- the interest in Indiana -- that Indiana

19  has an interest in the regulation of its manufacturers, but

20  California does not?  That's how you're reading *Chen III*?

21         **MR. AZADIAN:**  "Where there is" -- and *Chen* does state

22  this, "Where there is no injury to a plaintiff, California

23  plaintiff, and where that injury does not occur to a

24  non-California plaintiff in California."

25         The territory is very important.  And the Court says it

1    no less than six times in that decision.

2           Now, Plaintiffs do not cite any authority to the

3    contrary.  And this Court -- they have decided *forum non*

4    *conveniens* cases.  But those cases are materially different,

5    substantively different on the law, because they involve what

6    this -- what Federal courts and State courts agree are equitable

7    doctrines invoking the discretionary power of the Court to

8    decline to exercise jurisdiction.  And they categorically do not

9    involve choice of law questions at all.

10           **THE COURT:**  I mean, that's a distinction, but I don't

11    think if the California Supreme Court says in that context that

12    the State does have an interest in the regulation of its

13    manufacturers and design decisions that are made in the state.

14    And, in fact, they say it's not that -- it's not as significant.

15           In this case, it's because we have plenty of these

16    cases already pending that involve California citizens in a

17    California State Court, so there should be plenty of California

18    law governing this matter.  I mean, they recognize that

19    interest, and I don't think we can just say they recognize that

20    interest only as relevant to the question.

21           They are equitable decisions made in the *forum non*

22    *conveniens* context.  They say -- and that is -- unlike *Chen III*,

23    that is truly binding in terms of thinking about what California

24    law is.  You know, I follow the California Court of Appeal

25    decisions to the extent that, you know, I properly think that

1    the California Supreme Court would agree with those decisions.

2    It's a different matter as opposed to what the California

3    Supreme Court itself has said.

4        **MR. AZADIAN:**  Well, I would ask the Court to consider

5    *Barron* and *McCann*, which are California Supreme Court cases on

6    choice of law, and not to -- and not to rule on the basis of a

7    *forum non conveniens* case.

8        The thing about *forum non conveniens* is that what is

9    good for the goose isn't always good for the gander.  And where

10    you have an identified interest in the *forum non conveniens*

11    context, that doesn't mean that that same identified interest is

12    what carries the day in a choice of law analysis.

13        **THE COURT:**  It's not whether it carries the day, but

14    it's an interest.  And, again, if the interest is up against

15    what seems to be a presumption and a hypothetical interest on

16    the Maryland side, it's, you know, the question -- you know,

17    that seems to be the question.

18        **MR. AZADIAN:**  Yeah.  And I don't think we're dealing

19    here with a hypothetical interest on the part of Maryland,

20    because here, what we have is Maryland residents that were

21    injured in Maryland.

22        **THE COURT:**  Right.  But, again, Maryland's response to

23    this question is if they were injured in Maryland, great, we'll

24    apply our law.  If they're injured in Virginia, then we'll apply

25    Virginia's law.  If they were injured in Delaware, we'll apply

1    Delaware's law.  That's its interest.  And so, again, it's -- we

2    can presume the state there is a general state interest in

3    regulation of torts occurring within, or at least partially

4    occurring or resulting from incidents -- I will say torts --

5    let's not use occurring in -- but torts relating to incidents

6    that occur within state borders.

7          I mean, certainly it's reasonable to think there is

8    some interest in that.  But it doesn't seem like we have much in

9    the way of stronger statements from Maryland and its courts or

10   Supreme Court about that interest.  I mean, we're sort of

11   relying on California cases describing other states' interests

12   and in thinking about what other states' interests might be.

13   But, you know, it's striking to me that we don't have much in

14   the way of Maryland saying we have a -- you know, on these

15   questions, on the products liability questions.

16         I think you may have a different question as to the

17   question of noneconomic damages.  At least there, you've got an

18   act by the Maryland legislature that was enacted for a

19   particular purpose.  You know --

20         **MR. AZADIAN:**  And the warnings laws, and also the

21   defense that arises when you have warnings in an owner's

22   manual --

23         **THE COURT:**  But those are product liability questions

24   that, again, I would say, you know, it's interesting that we

25   just -- they would say, you know, happened -- you happened to

1    have crossed the border from Maryland to Virginia over there,

2    and we'll -- then the moment you cross that border, we don't

3    care about our product liability laws at all.

4            **MR. AZADIAN:**  And the borders are very fluid because

5    people work in all parts of that beltway.  And that's why they

6    call it the beltway.  And, again, I haven't researched that,

7    Your Honor.  I appreciate the Court's bringing that, you know,

8    question to our attention.  I would very much like to provide a

9    supplemental brief that analyzes this for the Court, as I can

10   see the Court is very interested in it.

11           But I also know that the Court mentioned step three.

12   And I think that's maybe where the Court's going with this

13   question.  And that is, if there was a true conflict -- we don't

14   think there is -- Maryland's interests, would they be more

15   impaired than California's interests.

16           And here is where I think there is no true conflict,

17   because Maryland is the state with the greatest interest in this

18   case.  If you were just to look at it from the perspective of

19   *McCann*, *Barron*, two California Supreme Court decisions, and

20   *Chen III*, which is perfectly in line with those two decisions.

21           Plaintiffs are Maryland residents.  Their complaint of

22   injuries occurred in Maryland in a Maryland parking lot when a

23   Maryland resident accelerated her vehicle into Ms. Jackson.

24   This case is at least as much about Maryland's driver -- that

25   Maryland driver's recklessness as it is about Tesla's design and

1    manufacture of its Model 3 vehicle.

2            And so what's puzzling to me is Plaintiff's argument

3    that -- in its brief that Maryland's interests would not be

4    impaired because Tesla is not based in Maryland.  The California

5    Supreme Court rejected this argument that states do not have

6    legitimate interests in regulating the conduct of out-of-state

7    businesses that affect their residents.  In fact, in California,

8    the California Supreme Court in *McCann* held this, and I quote:

9            "When a state adopts a rule of law limiting liability

10           for commercial activity conducted within the state in

11           order to provide what the state perceives is fair

12           treatment to and an appropriate incentive for business

13           enterprises, we believe that the state ordinarily has

14           an interest in having that policy of limited liability

15           applied to out-of-state companies doing business

16           there."

17   We believe that --

18           **THE COURT:**  Right.

19           **MR. AZADIAN:**  That's the California Supreme Court in

20   *McCann*, the case -- that presumption.

21           **THE COURT:**  Right.  I mean, the other part of the issue

22   you have here is that what we're -- set aside for a second the

23   noneconomic damages, because you do have that having been

24   adopted.  Its purpose is to limit liability in some respects.

25           I mean, on the products liability questions, what we're

1  essentially talking about is, you know, differences in some

2  instance.  There is one I want to ask you about.  But, you know,

3  smallish differences in the way that the Maryland courts, as a

4  matter of common law, have construed their own strict

5  liability regime.

6        They've adopted a strict liability regime.  They've

7  adopted parts of the statement that the California courts have

8  not.  But that -- we're sort of -- I'm not sure that you can

9  view in these decisions in the state courts about the way in

10  which they're going to construe what is effectively they are

11  both strict liability -- products liability regimes that are

12  available.

13        You know, these are slight differences in the way they

14  do things that we think, you know, perceive some fantastic state

15  interest underlying in the application of their particular

16  version of common law as opposed to California's version of

17  common law.

18        **MR. AZADIAN:**  I don't think we're looking for a

19  fantastic interest.  We're just looking for one that's not just

20  merely a hypothetical.

21        **THE COURT:**  Let's assume I don't agree with you on

22  California's interest --

23        **MR. AZADIAN:**  Let's just stay with the same terms that

24  the California Supreme Court had -- or the Ninth Circuit had.

25  Who has the greater interest?  And here, we argue it's Maryland.

1   It has to be Maryland.

2           **THE COURT:**  Because they were -- you know, they were

3   particularly -- the courts, when they attempted these common law

4   principles, were concerned about the possibility of some other

5   state may, under circumstances where there's a question of

6   choice of law, might go a little further?

7           **MR. AZADIAN:**  Well, it's not just common law

8   principles.  It's also statutory principles.  I mean, Maryland

9   is a --

10          **THE COURT:**  But the only statutory law we're talking

11  about really is the cap on nonpunitive damages; correct?

12          **MR. AZADIAN:**  I have to go back to trace my steps to

13  see if any of those common law decisions come also out of the --

14          **THE COURT:**  Right.  I was reading that -- the Maryland

15  cases I was reading this morning, there was some thought in the

16  wake of some of them of changing Maryland law one way or the

17  other, and ultimately they changed their gun regulations rather

18  than changing --

19          **MR. AZADIAN:**  We've changed, you know, spirits --

20          **THE COURT REPORTER:**  Please wait for the judge to

21  finish.  I'm so sorry.  Thank you.

22          **THE COURT:**  Let me ask you -- the one question I wanted

23  to ask you about is the merger question.  You know, it appears

24  that there is at least Maryland Court of Appeal authority

25  recognizing that you can pursue a negligence claim alongside a

1    strict liability claim in a products liability context.  I have

2    *Iron Hustler Corp*, 59 Md App 408(1984).

3            Is there any reason that that doesn't suggest that

4    there isn't actually a material difference between California

5    and Maryland law with respect to that question?

6            **MR. AZADIAN:**  With respect to having a negligence claim

7    proceed with a strict products liability claim, I'm not aware of

8    one.

9            **THE COURT:**  Okay.  Have you looked at *Banks v. Iron*

10   *Hustler Corp*, 59 Md App 408(1984)?

11           **MR. AZADIAN:**  *Iron Hustler*?  No, I haven't.  I'll

12   certainly read it, Your Honor.

13           **THE COURT:**  It does appear to say that subsequent cases

14   made clear strict liability merely takes its place alongside

15   negligence and breach of warranty as an alternative basis of

16   liability.

17           I mean, if that's -- unless that's been overturned,

18   that would suggest there isn't a difference between California

19   and Maryland law; correct?

20           **MR. AZADIAN:**  I think on that one point.  But what

21   we're talking now is about *decoupage* [ph].

22           **THE COURT:**  No.  We're talking about -- I mean -- one

23   of the six points you made was the argument that -- I think it

24   was the fifth argument, I think, was the argument that in

25   California, strict products liability and negligence are

1    distinct, whereas in Maryland -- I think this is right -- in

2    Maryland, the negligence claim essentially merges into the

3    strict liability period.

4            MR. AZADIAN:  I think we did make that argument that

5    they merge together.  Yeah, I think we cited a case for that.

6    But I wasn't -- I'm not aware of the *Iron Hustler* case.  I will

7    certainly read it, Your Honor.

8            THE COURT:  Maybe I've got it flipped around.  It may

9    be that that is the Maryland law and your argument was that it's

10   not California law, but that there is --

11           MR. AZADIAN:  That's the argument we made.

12           THE COURT:  Yeah.

13           MR. AZADIAN:  Correct, Your Honor.

14           THE COURT:  And I guess the problem -- so then let me

15   ask you about the California case I think that's been cited.

16           MR. AZADIAN:  Okay.  That explains --

17           THE COURT:  *Merrill vs. Navegar*, 26 Cal 4th 465, 2001,

18   Plaintiff may seek recovery in product liability case either on

19   the theory of strict liability in court or on this theory

20   that --

21           THE COURT REPORTER:  I'm sorry, Your Honor, could you

22   slow down a little bit for me, please?

23           THE COURT:  Oh.  So the *Merrill* case,

24   26 Cal 4th 465, 2001, stating, "A plaintiff may seek recovery in

25   a products liability case either on the theory of strict

1  liability in tort or on the theory of negligence."

2        I mean, doesn't that make it clear that both states

3  allow the pursuit of different theories?

4        **MR. AZADIAN:**  The question is whether they merge

5  together, as they do in Maryland.

6        **THE COURT:**  Well, no.  I think -- as we said, I

7  misstated your argument.  I think the argument you made is that

8  they don't merge in Maryland and they do merge in California.

9  But this suggests they don't merge in California.

10       **MR. AZADIAN:**  Well, I would be able to point to you

11  cases, Your Honor, where it's not an "or," but it's an "and/or,"

12  or it is a -- you know, it is -- what is it called -- it is not

13  a merger in California.

14       So I would -- I would ask if the Court is going to, you

15  know, go down that path, that we could submit a supplemental

16  brief analyzing that particular issue.

17       What we have pointed to the Court is five areas that I

18  believe are very substantive differences that affect the actual

19  claims without a *defecage* [ph] analysis.  Number 1, that

20  Maryland law --

21       **THE COURT:**  Right.  I'm aware very well from the

22  briefs.  And I think I have a -- generally, I think there's been

23  a lot of briefing before me, so I think I have the means I need

24  to take a look at the case law and decide whether there is a

25  difference and to apply the standard if I conclude there is a

1    difference on these issues.

2         The only one that I -- the main one I had some

3    questions about, this question of difference, was this -- I

4    think the fifth, which I think was the sort of fifth principle

5    of Maryland law you had moved to apply, which goes to whether

6    strict liability and negligence merge or can be pursued

7    alongside --

8         **MR. AZADIAN:**  I think -- I can tell you from experience

9    that, you know, both of them tend to -- just practically

10   speaking -- I'm sure Your Honor knows this as well -- that they

11   do both tend to have a practical effect of merging together in

12   trials.

13        **THE COURT:**  I mean, yeah.  And it sort of -- in some

14   ways, you could say in California, as they say, the risk benefit

15   analysis becomes -- risk utility analysis becomes some kind of

16   version that looks like negligence in some sense.  I mean, as I

17   think of -- well, yeah.  Okay.

18        Okay.  I do want to give Plaintiff an opportunity to

19   respond to the arguments.

20        **MR. AZADIAN:**  I can see the Court would like me to wrap

21   up, so I'll just go ahead.

22        **MR. McDEVITT:**  So starting backwards, Your Honor, I

23   think you're correct, that both states -- on that issue, both

24   states recognize that you can pursue negligence and strict

25   products liability simultaneously.

1          I think as a counselor, you get into a -- it's a

2     strategic decision, because you could face potentially

3     inconsistent verdicts.  But that's a -- that's on counsel.  And

4     one good example of where you could pursue both is clearly

5     California allows for negligence post sale, which does not merge

6     with strict liability.  That's distinct.  And there's a separate

7     set of jury instructions.

8          And here, that would come into play, because as we've

9     indicated in our filings, Tesla's design influence in

10    interaction with people doesn't stop once it leaves their hands.

11    They're constantly sending updates through the Internet that

12    change the way the vehicle functions fundamentally.  So that

13    would be negligence, not strict liability.

14         And just coming back to, I think, one of the first

15    questions that the Court seized on, which was the second prong

16    of the analysis, does California have an interest.  And in the

17    brief -- as the Court noted, the *Stangvik* case was a *forum non*

18    *conveniens* case.  However, one of the factors in that analysis

19    is the state's deterrent and regulatory interests in product

20    manufacturers here.

21         So the question is, does the state have an interest.

22    And it's also worth noting, Your Honor, that in *Stangvik*, the

23    cases that the Court cites in support of the notion that there

24    is a state interest include *Hurtado*, which is a choice of law

25    case.

1          And in *Hurtado*, the California Supreme Court makes

2   clear that California does have a strong interest in regulating

3   its -- the products manufacturers that are within its state for

4   a deterrent effect.  And in particular, the Court -- California

5   Supreme Court notes the "Sting of unlimited recovery, which more

6   effectively penalizes the culpable defendant, and deters it and

7   others similarly situated from such future conduct."

8          So California does have an interest in applying its

9   product liability regime to resident defendants, which Tesla is

10  at all times, or up until the -- the incident in question.  And

11  just briefly, Your Honor, in the *Reich* case, the Court notes

12  that for the purposes of the analysis, we're looking at where

13  were the residencies of the parties up until the moment of the

14  tort.

15         And in this case, Tesla was headquartered here in

16  California all the way up through when this incident happened

17  in -- and that's, for the record, if we look to the docket

18  filing Number 1, at paragraph 7, Tesla, in their pleading, notes

19  that their headquarters was in Palo Alto until December of 2021,

20  which was after the incident.

21         In addition, I think to the Court's question about --

22  or the Court's comment that, yes, the Court does have to follow

23  California Supreme Court precedent, and to the extent there's a

24  Court of Appeal decision, that's not necessarily binding the

25  Court's looking at what the California Supreme Court would do, I

1    think it's clear that the Court would not follow the rationale

2    in *Chen III* about there being no interest if the plaintiff -- if

3    there was no plaintiff in California.

4        And I think that's actually clear if you look at the

5    *Hurtado* decision, Your Honor.  The Court talks about the

6    decision in *Ryan vs. Clark Equipment*, and notes that in that

7    case, one of the issues was the manufacture of a front-end

8    loader that was in Michigan and then an incident that happened

9    in Oregon.

10       And the Court notes that Michigan -- insofar as the

11   defendant with a Michigan corporation and allegedly conducted

12   tortious conduct in Michigan, that state had an interest in

13   subjecting the defendant to unlimited liability in order to

14   deter such conduct, which is directly analogous to the situation

15   we have here.

16       **THE COURT:**  Let me ask you.  I mean, one of the

17   differences here is the statutory cap on certain damages.  And I

18   know that that -- you know, there was a specific issue, this

19   question of liability insurance and its increasing costs in

20   Maryland, that was addressed in -- by the Legislature when it

21   enacted that.

22       But doesn't that suggest some sort of broader interest

23   in limiting the costs of doing business in Maryland and limiting

24   the cost of selling products to Marylanders that at least should

25   be considered in the analysis here?

1      **MR. McDEVITT:**  No, Your Honor.  And actually, if you

2  look at *Hurtado*, the Court I think makes pretty clear that it

3  says in *Hurtado*, the Court indicates that -- excuse me -- I just

4  want to find it -- it says, "Mexico had no interest in applying

5  its limitation of damages in a wrongful death action to

6  nonresidents defendants or in denying full recovery to its

7  resident plaintiffs."

8      So the Court is saying that a state does not have an

9  interest in denying full recovery to its resident plaintiffs.

10  And it doesn't have an interest in limiting the damages of a

11  nonresident defendant, which would be Tesla here.

12      **THE COURT:**  I mean, I guess the thing I'm struggling

13  with is -- and a lot of this, we're talking a lot about

14  California Supreme Court decisions.

15      I mean, isn't -- it's odd to -- I mean, I know is this

16  a question of state law where we're applying California's law,

17  but it's odd to say Maryland may have said they have an interest

18  in this question, but the California Supreme Court has said

19  that's not a valid interest.  It's not worth considering.  I

20  mean, how do we -- it's an odd situation to be in.

21      **MR. McDEVITT:**  I understand, Your Honor.  But I think

22  if you look through the thread of the decisions, the focus is

23  on -- to the extent there's caps, the focus is on protecting

24  resident defendants.  And I'll note there's no evidence in the

25  record, in the moving papers, there was no evidence presented by

1    Tesla that Tesla was lawfully doing any business in Maryland.

2            The only evidence in the record about the purchase of

3    the vehicle was that it was designed in California, manufactured

4    in California, purchased over the Internet, so it was sold in

5    California, and then it was distributed to a Tesla entity in

6    New York.

7            So that's where there's a distinction from the *McCann*

8    case.  In *McCann*, we're talking about a company -- it was an

9    out-of-state company, but it specifically designed a multiton

10   device for installation in the State of Oklahoma.  It was

11   specifically targeting that state.  It was -- designed it for

12   that state.

13           And so there was a -- there was more interaction of the

14   defendant with that state, the nonresident defendant.  So it

15   made sense there to say, yes, the state has an interest with

16   respect to a nonresident defendant to the extent they are

17   actually doing something specifically for the state.

18           Here, we don't have -- as I mentioned, Your Honor,

19   there's nothing in the record indicating that Tesla has any

20   business presence in Maryland.  So on these facts, the only -- I

21   don't see how the Court could say, yes, Maryland's interests

22   would be further impaired here if -- if California law was

23   applied, when there's no -- nothing indicating that Tesla had

24   any business interests in the state.

25           **THE COURT:**  I mean, I guess -- but there's a broader

1    question of sort of not wanting to impede the flow of goods into

2    the state and sale of goods to Marylanders by virtue of overly

3    onerous risks of products liability; right?

4         And I think they may apply this cap if a product is

5    manufactured in California and sold to a distributor in Maryland

6    who then -- or purchased, you know, in California and brought

7    there and then sold.  They would apply a cap if we were in

8    Maryland State Court, right, on these claims?

9         *MR. McDEVITT:*  If they're applying Maryland law, I

10    would say, yes, Your Honor.

11         *THE COURT:*  Okay.

12         *MR. McDEVITT:*  But if we look also at the California

13    Supreme Court decision in *Reich*, the Court notes, "A defendant

14    cannot reasonably complain when compensatory damages are

15    assessed in accordance with the law of his domicile."

16         So in other words, Tesla can't complain that we're in

17    Maryland, but we're going to be -- there's not going to be a

18    cap, because that's the laws of the state where they're

19    domiciled.  That's the law of the state where their headquarters

20    was located.

21         And then one other -- I just want to clarify the

22    record.  Counsel was talking about the history of the *Chen*

23    decision going up to the Supreme Court and coming back down.

24         The California Supreme Court's sole question that it

25    was addressing was whether it was mandatory for the Trial Court

1    to revisit the choice of law decision once the settlement

2    occurred.  It was nothing beyond that.  And it said, you may do

3    it, you may not, it's not mandatory.

4            And then when it came back to the Appellate Court for

5    *Chen III*, the question there was not whether the choice of law

6    analysis with the Indiana defendant out.  It was the original

7    decision at the time it was made, was -- was there an error

8    there by the Court when the Indiana defendant was in the case.

9            And I think, as Your Honor noted, it's nonsensical to

10   say that *Chen III* supports the notion that California has no

11   interest in applying its law to Tesla in this case when the

12   analogy is in *Chen III*, the Indiana company designed,

13   manufactured, and sold the bus, and the incident didn't happen

14   in Indiana.

15           But yet the Court said they did have an interest in

16   applying their law.  So by that analogy, and I think that's the

17   correct way to read *Chen III*, California does have an interest

18   here in applying its products liability law to Tesla.

19           **THE COURT:**  I mean, the thing I do want to make it

20   clear is that, you know, there's a question on -- it's not

21   necessarily -- there's a different question.  There was a

22   petition for review.  It was denied.  That is somewhat

23   subjective of the California Supreme Court's view of rightness

24   or wrong.  It's not dispositive, but it's some suggestion.

25           But the real question is do I think the California

1    Supreme Court would take that language to be entirely

2    dispositive and to reach far beyond the facts of the case that

3    was specifically presented there, which was a case that

4    ultimately had this hook to California by virtue of the

5    distributor that ordered the bus, but kind of all of the other

6    relevant pieces were nonresidents, accident elsewhere,

7    manufactured elsewhere.

8            So, you know, it could be that my conclusion is that

9    it's a proper statement of California law as to the statement of

10   facts in the case and that the Supreme Court agreed on that, but

11   need not be taken any further.

12           **MR. McDEVITT:**  Can I just put one thing in the record

13   on that specific issue, actually, Your Honor?

14           So, actually, the Court, under Ninth Circuit and

15   California Supreme Court law, is not to read anything into the

16   California Supreme Court's denial of the petition to review.

17   And I'll just give the cites for the record.  It's *Ryman vs.*

18   *Sears Roebuck Co.*, 505 F.3d 993,995 -- or at 995, Footnote 2.

19   That's a 2007 Ninth Circuit case.

20           And the California Supreme Court has explicitly

21   instructed that its refusal to grant a hearing in a particular

22   case is not to be construed as an affirmative approval of an

23   intermediate Appellate Court opinion.  And that -- the cite

24   there is *Trope vs. Katz*, 11 Cal. 4th 274 at 287, Footnote 1.

25   That's a 1995 case.

1    And then the Ninth Circuit heeding that instruction

2    could be found in the case *In Re KF Dairies, Inc. and*

3    *Affiliates*.  That's 224 F.3d. 922 at 925, Footnote 3.  And

4    that's a 2000 Ninth Circuit decision, and for some reason, those

5    are all in footnotes.  I don't know why.

6        **THE COURT:**  Okay.  I appreciate that.  Thank you.

7        Okay.  Let me give Tesla's counsel two minutes for

8    rebuttal.  We have been going for quite a while.

9        **MR. AZADIAN:**  Your Honor, I would not suggest to you

10    that *Chen III* is simply, you know -- considered.  I would

11    suggest it's binding.  And that's because it cites *McCann*.  It

12    cites *Bernhard*.  Not because the California Supreme Court denied

13    review, but because it is consistent with those two California

14    Supreme Court decisions.  And those are the two decisions that

15    we principally rely on in our brief.

16        The reason why *Chen III* is important is because it

17    involves this very bold statement of what the rules are in

18    California for choice of law.  And that's why, when you look at

19    *Chen III*, and you look at *Reich*, and you look at *Hurtado*, *Reich*

20    and *Hurtado* involved one point, and that was that California has

21    a legitimate interest in applying its laws to nonresidents who

22    are injured within California.  That is not a surprising

23    concept, and we're not arguing that here.  Neither side is.

24        The point here is this injury did not happen in

25    California.  The plaintiffs are Maryland residents.  It happened

1    in Maryland.  And it happened by another Maryland resident.  And

2    this idea that somehow the car was purchased over the Internet

3    and -- the car was purchased in Maryland over the Internet and

4    was delivered to her in Maryland.

5         What brings us full circle, then, is to the

6    well-settled law in California, and this is quoted in *Chen III*,

7    that "the reach of California's lawmaking power in respect of

8    its products liability policy is appropriately confined to the

9    protection of California residents and persons injured within

10   California's borders."

11        And on that, Your Honor, I will submit.  But I would

12   ask -- the Court did raise some questions today, and I would ask

13   that we be allowed an opportunity to respond through a

14   supplemental brief with the aid of further research and inquiry.

15        **THE COURT:**  I think I have a lot of briefing before me

16   already on the three motions that are pending, so I don't

17   think -- and I know that there's some other -- if this case

18   stays -- will also need to be resolved 702, that exclusion

19   between them.  Sorry.  I've been corrected.  I'm not supposed to

20   say -- we have two motions.  So I don't think I need further

21   briefing at this time.

22        But the case has been, you know, exhaustively

23   well-briefed and argued, and I will take -- all three motions

24   will be taken under submission, and I will issue an order, or

25   more, as appropriate, based on my decisions.  Thank you.

1        **MR. McDEVITT:**  Thank you, Your Honor.

2        **MR. AZADIAN:**  Thank you.

3     **(Proceedings adjourned at 11:16 a.m.)**

4                        **\*\*\***

5                 *REPORTER'S CERTIFICATE*

6        I, Anne Roldan, certify that I am a duly qualified
and acting Official Court Reporter for the United States
7  District Court, that the foregoing is a true and accurate
transcript of the proceedings as taken by me in the
8  above-entitled matter on February 20, 2025; and that the format
used complies with the rules and requirements of the United
9  States Judicial Conference.

10  Date:  February 26, 2025

11

12  *Anne Roldan, RMR, CRR, CSR 13095*