UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SYLVIA JACKSON, et al., | Case No. 22-cv-04380-PCP |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTIONS TO DISQUALIFY, TRANSFER, AND APPLY MARYLAND LAW** |
| TESLA, INC., | |
| Defendant. | |

In this products liability case involving a Tesla Model 3 vehicle, defendant Tesla, Inc. moves to disqualify me, to transfer the case to the United States District Court for the Southern District of Maryland, and to apply Maryland products liability law. For the reasons set forth below, Tesla's motions are denied.

## BACKGROUND

On the evening of November 24, 2021, plaintiff Sylvia Jackson stood near the trunk of her car in the parking lot of the Giant grocery store in Germantown, Maryland.[1] She had just finished shopping for groceries. As Ms. Jackson loaded bags into her car, an individual driving a 2020 Tesla Model 3 slowed to a stop directly behind Ms. Jackson's vehicle and waited for her to finish unloading her groceries. Without warning, the Model 3 moved forward at 100 percent acceleration and slammed into Ms. Jackson's vehicle, crushing Ms. Jackson between two cars. The driver of the Model 3 later told the police that she did not step on either the brake or the gas pedal and that the vehicle "just moved forward."[2] Although Ms. Jackson survived the incident, her injuries

---

[1] Unless otherwise stated, the following facts are taken from Jackson's complaint.

[2] Jackson refers to the phenomenon of a Tesla moving forward without prompting as "sudden unintentional acceleration." At the Court's hearing on these motions, the parties appeared to agree that this case involves a "pedal confusion incident," meaning that the driver pressed the gas pedal

1    required the amputation of both legs above the knee.

2        Tesla's Model 3 includes many features that distinguish it from other vehicles. For

3    example, the Model 3 is a fully electric vehicle that operates without a typical combustion engine.

4    This means not only that it can accelerate quickly and with instantaneous torque but also that the

5    Model 3 is much quieter than a vehicle with a standard combustion engine and can accelerate to

6    high speeds without making a noise that might warn pedestrians of its movement. The Model 3

7    also includes a "vision system," a series of cameras and radars that allow the vehicle to detect its

8    surroundings and provide data inputs for various Tesla safety features.

9        Ms. Jackson alleges that three of these safety features failed to deploy when the Model 3

10   accelerated toward her. The Automatic Emergency Braking ("AEB") feature relies on the vision

11   system to detect objects in the vehicle's path. Tesla designs the AEB to automatically deploy the

12   brakes when the vehicle determines that a collision is unavoidable. Similarly, the Obstacle-Aware

13   Acceleration ("OAA") feature reduces motor torque and may also apply the brakes when the

14   vehicle is moving at speeds below 10 mph and detects an object in its path. The Pedal

15   Misapplication Mitigation ("PMM") feature engages and interrupts the vehicle's acceleration

16   when a driver inadvertently steps on the accelerator while an object is in the vehicle's path. Tesla

17   officials have publicly stated that Tesla designed the PMM to prevent pedestrian-involved

18   accidents like those that may result when a driver inadvertently floors the accelerator while

19   maneuvering into or out of a parking spot. Ms. Jackson alleges that, at the time of the accident, the

20   Model 3's vision system issued a "Forward Collision Warning" but failed to activate the AEB,

21   OAA, or PMM.

22       Although the collision occurred in Maryland and both the driver and Ms. Jackson are

23   Maryland residents, Tesla conducted much of the Model 3's design and engineering in California.

24   Tesla also manufactured the Model 3 at its plant in Fremont, California. This factory manufactured

25   nearly 450,000 units in 2021, more than any other North American auto plant. In Ms. Jackson's

26   responses to the motions before the Court, she alleges that Tesla's California-based employees

27

28   _____

     when intending to press the brake pedal.

United States District Court
Northern District of California

regularly update the software that operates the Model 3's software and safety features, including after it sells a vehicle, via a cellular or Wi-Fi connection. The parties do not dispute that the owner of the vehicle that hit Ms. Jackson purchased it online from Tesla in California, that Tesla transferred title to the owner through Tesla Motors New York, LLC, and that the owner retrieved the vehicle from a Tesla service center in Maryland.

Ms. Jackson filed this lawsuit on June 1, 2022 in Santa Clara County Superior Court, asserting claims of strict products liability, negligence, and loss of consortium. Tesla removed the case to federal court on July 28, 2022, contending that the Court has diversity jurisdiction over the matter because Ms. Jackson resides in Maryland and Tesla is incorporated in the state of Delaware and has its principal place of business in the state of Texas.

Before the Court are three Tesla motions. Tesla first moves to disqualify me from this cased based on my prior employment with a law firm that was adverse to Tesla in two lawsuits. Next, Tesla moves to transfer the case to the United States District Court for the Southern District of Maryland. Finally, Tesla moves the Court to apply Maryland products liability law to the facts of this case.

## TESLA'S RECUSAL MOTION

Tesla moves to disqualify me pursuant to 28 U.S.C. §455(a), which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Courts apply a reasonableness standard to this statute, asking "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) (cleaned up and citation omitted). "The reasonable person is not someone who is hypersensitive or unduly suspicious, but rather a well-informed, thoughtful observer." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (citations omitted). The Ninth Circuit has cautioned against construing the recusal statute "so broadly … that it becomes, in effect, presumptive" upon the "merest" hint of "personal bias or prejudice." *Id.* (citations omitted).

Tesla argues that my employment as an associate and partner at the law firm Altshuler Berzon LLP prior to taking the bench requires my recusal. During my time with Altshuler Berzon

United States District Court
Northern District of California

LLP, the firm represented Tesla employees in two lawsuits in which Tesla was the defendant. The first case, *Diaz v. Tesla*, No. 3:17-cv-6748 (N.D. Cal.), was an individual employment discrimination case that resulted in a jury verdict against Tesla and an ultimate award of $3,175,000 to the plaintiff. During that litigation, the plaintiff's counsel filed a letter brief with the court that included in the letterhead the name of every attorney then employed with Altshuler Berzon LLP, including mine. Altshuler Berzon LLP also posted an article about the case on its website. The second case, *Vaughn v. Tesla*, No. RG17882982 (Super. Ct. Alameda County), involves claims of employment discrimination brought by a putative class of Tesla employees. I took no part in either case and did not represent any of the plaintiffs. Tesla does not contend otherwise.

Tesla's motion to disqualify me fails for two separate and independent reasons.

First, Tesla's motion is untimely. Judge Freeman transferred this case to me on August 18, 2023. At that time, my employment history was public knowledge, as was Altshuler Berzon LLP's involvement in both *Diaz* and *Vaughn*. Tesla nonetheless waited nearly seventeen months to file this motion. When it finally did so, discovery was complete and the trial was scheduled to begin in four months.

"[I]t is well established that a motion to disqualify or recuse a judge under … § 445 must be made in a timely fashion." *Preston v. United States*, 923 F.2d 731, 732–33 (9th Cir. 1991). To avoid the risk that litigants will use recusal motions for "strategic purposes," the Ninth Circuit requires such motions to "be filed with reasonable promptness after the ground for such a motion is ascertained." *Id.* at 733. Tesla has not provided any reasonable explanation for its failure to bring this motion sooner.[3] The motion's untimeliness is sufficient on its own to warrant denial, and the Court denies it on that basis. *See Davies v. C.I.R.*, 68 F.3d 1129, 1130–31 (9th Cir. 1992).

---

[3] Tesla argues that its motion is timely because at the time it filed this motion I had yet to preside over any substantive issue in the case. But the timeliness standard required Tesla to promptly file its motion upon discovery of the basis for recusal regardless of the issues then-pending before the Court. *See Preston*, 923 F.2d at 733. Tesla cites no binding authority to the contrary, and the non-binding authority that Tesla relies upon to support its position is factually distinct and therefore unpersuasive. *See United States v. Furst*, 886 F.2d 558, 579–83 (3d Cir. 1989). Notably, Tesla has never moved to disqualify me in the other matter currently pending before me in which Tesla is a defendant and in which I have already issued substantive rulings.

Second, Tesla's motion fails on the merits. In essence, Tesla seeks to disqualify me because I was employed by a law firm while other attorneys at my firm represented a party adverse to Tesla in litigation. The *Diaz* and *Vaughn* employment discrimination lawsuits, however, involved plaintiffs different from the plaintiff here, arose from entirely distinct sets of facts, and involved unrelated bodies of law (employment discrimination law in *Diaz* and *Vaughn*, products liability law here). There is thus no reasonable basis to conclude that anything from that litigation will bear upon the issues presented here.[4]

Instead, Tesla's motion is premised on the idea that my former law firm's mere representation of Tesla's opponents in litigation means that I am personally biased against Tesla. A reasonable person understands, however, that a law firm's representation of a particular client does not impute everlasting partiality as to all parties adverse to that client. As Judge Mehta artfully explained, "[r]easonable, well-informed observers understand that law firms represent a variety of clients. They also understand that lawyers personally, and law firms as institutions, do not necessarily agree or identify with their clients' actions or interests. After all, lawyers and law firms advocate for clients, even when their clients' interests conflict with their own personal beliefs. That is the hallmark of lawyering." *Philip Morris USA Inc. v. U.S. Food & Drug Admin.*, 156 F. Supp. 3d 36, 50 (D.D.C. 2016).

If Tesla's proposed interpretation of 28 U.S.C. § 455(a) were accepted, federal judges would have to recuse themselves from any case in which any other attorney at their former firm had ever been adverse to a party in the case now before them. For judges who worked for firms much larger than Altshuler Berzon LLP that represent hundreds or thousands of clients at a time, the scope of this recusal obligation would be enormous, substantially disrupting the courts' ability to secure the just, speedy, and inexpensive resolution of court proceedings. Reasonable persons do not expect this outcome, and the law does not require it.

Tesla attempts to bolster its argument by noting that my name appeared on Altshuler

---

[4] Although not necessary to this Court's holding, I note again that I had no substantive involvement in either case, that no Altshuler Berzon LLP attorney has appeared in this case, and that Tesla does not allege that Altshuler Berzon LLP ever represented the plaintiff here.

Berzon LLP letterhead used to submit a letter brief in *Diaz* and that Altshuler Berzon LLP promoted their work on *Diaz* on the firm's website. These reflect typical law firm practices and do not suggest any unique circumstances calling into question my impartiality or ability to separate my former colleagues' roles as lawyers from my current role as a judge.

Tellingly, federal judges have previously denied recusal motions where the judge's prior employment at least had an arguable relationship to the issues presented in the case before them. In *Philip Morris USA Inc. v. U.S. Food & Drug Admin.*, 156 F. Supp. 3d 36 (D.D.C. 2016), for example, the plaintiffs were a group of tobacco companies challenging certain tobacco regulations. The tobacco companies sought Judge Mehta's recusal because his former firm had represented an anti-tobacco organization that filed comments in support of the regulations then at issue; because Judge Mehta's wife remained a partner at his former firm; and because Judge Mehta's former partner had appeared in the case on behalf of the government. Judge Mehta denied the motion, reasoning that he had no involvement with the firm's representation of the anti-tobacco organization, that lawyers and firms do not always agree or identify with their clients' actions or interests, and that his wife's employment and his relationship with the government's lawyer would not cause a reasonable person to question his impartiality.

Similarly, *In re Apex Oil Co.*, 981 F.2d 302 (8th Cir. 1992), a party moved to disqualify Judge Loken based on his former law firm's litigation against the defendant in the case before him, which included appearing "in a prelitigation videotape that described the effects of [the defendant's purported actions] on the plaintiff[s]." *Id.* at 303. Judge Loken denied the motion, concluding that a "reasonable member of the public" would not question his impartiality because the plaintiffs in the two cases had entirely separate interests and the claims in the two cases were "completely unrelated." *Id.*

In light of Judge Metha and Judge Loken's well-reasoned decisions, and given that *Diaz* and *Vaughn* employment discrimination cases litigated by Altshuler Berzon LLP have no relationship whatsoever to the products-liability claims presented here, the circumstances of this case present an even more tenuous basis for recusal.

It may well be that the *Diaz* and *Vaughn* cases remain sensitive for Tesla given their "high

profile" nature (in Tesla's words). But recusal under 28 U.S.C. § 455 depends upon whether "a well-informed, thoughtful observer" would question the judge's impartiality, not whether "someone who is hypersensitive or unduly suspicious" might do so. *Holland*, 519 F.3d at 913. Tesla's idiosyncratic views regarding the sensitive and "high profile" nature of the *Diaz* and *Vaughn* cases cannot justify my abandonment of the obligation all federal judges share to "participate in [all] cases assigned," which "is derived from the 'judicial Power' with which we are vested" and "reflected in our oath, by which we have obligated ourselves to 'faithfully and impartially discharge and perform [our] duties' and to 'administer justice without respect to persons, and do equal right to the poor and to the rich.'" *Id.* at 912 (citing U.S. Const. art. III, § 1; 28 U.S.C. § 453). "Our mythic Justice, represented by a blindfolded figure wielding a balance and a sword, hears *all cases* coming before her, giving no preference—whether in priority or result— to the station or economic status of such persons." *Id.* (emphasis added). I have taken an oath to abide by this principle and will do so in this case as in all others.

Both because it is untimely and because it lacks merit, Tesla's motion to disqualify is denied.

## TESLA'S TRANSFER MOTION

Tesla moves to transfer this case to the United States District Court for the Southern District of Maryland. A presiding judge "may transfer any civil action to any other district or division where it might have been brought" if doing so would be more convenient for the "parties and witnesses" or would otherwise be "in the interest of justice." 28 U.S.C. § 1404(a). In considering a transfer motion, courts first determine whether venue is proper in the alternate district. *Id.* Courts then weigh various factors to determine whether transfer is appropriate. These factors include:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

1   *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000). The decision to transfer a

2   case ultimately lies within the discretion of the district court. *Id.*

3        Neither party disputes that the Court could transfer this case to the Southern District of

4   Maryland because venue would have been proper in that court had Ms. Jackson initially filed her

5   suit there. The Court nevertheless denies Tesla's motion for three reasons.

6        In the first place, Tesla's motion fails under the *Jones* factors.

7        Ms. Jackson's choice of this district as the forum in which to litigate her case is entitled to

8   weight, *see Lou v. Belzberg*, 834 F.2d 730, at 739 (9th Cir. 1987), and given Tesla's significant

9   business presence in this district, including through the product design and manufacturing

10  activities that gave rise to Ms. Jackson's claims, Tesla has not made "a strong showing of

11  inconvenience to warrant upsetting the plaintiff's choice of forum," *Decker Coal Co. v.*

12  *Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). The fact that California law will

13  apply to this dispute (for the reasons set forth below) also weighs in favor of conducting the trial

14  here. *See, e.g.*, *Chen v. Pioneer Oil, LLC*, 472 F. Supp. 3d 704, 713 (N.D. Cal. 2020).

15       Further, the "parties' contacts with the forum" weigh in favor of denying Tesla's motion.

16  *Jones*, 211 F.3d at 498. Although Ms. Jackson appears to have few contacts with this district,

17  Tesla has significant contacts with and business in the Northern District of California. Rather than

18  suing the driver of the Model 3 for negligent driving, Ms. Jackson sued Tesla for products

19  liability. As such, Tesla's contacts with this district—namely, its design, engineering, and

20  manufacturing activities—are centrally relevant to this case. Those contacts give rise to a clear

21  "local interest in the controversy," *Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980, 993

22  (N.D. Cal. 2011) (citation omitted), which in turn demonstrates that the "contacts relating to [Ms.

23  Jackson's] cause of action" are likely greater here than in the Southern District of Maryland. *See*

24  *Jones*, 211 F.3d at 498. Tesla may be right that it would have been more convenient for Ms.

25  Jackson to litigate in Maryland, but both parties have litigated in this district without complaint for

26  over two years. If this forum were overly burdensome for Ms. Jackson, she would either have filed

27  her suit in the Southern District of Maryland or moved to transfer the case long ago.

28       Finally, the "ease of access to sources of proof" does not strongly favor either party

United States District Court
Northern District of California

1  sufficient to warrant transfer. *Jones*, 211 F.3d at 499. Tesla argues that it would be more

2  convenient to hold the trial in Maryland because the driver and first responders all reside there.[5]

3  But the location of these witnesses is of less relevance here given the nature of Ms. Jackson's

4  lawsuit. The evidence required to prove or defend against her products-liability claims will more

5  likely relate to testimony detailing the design and operation of Tesla's safety features than to

6  physical evidence or eye-witness testimony about what happened on the day of the accident. Much

7  of what happened on that day appears undisputed by the parties. To the extent those facts are

8  critical, the parties do not dispute that Model 3's vision system recorded the entire incident, and

9  Tesla can seek to introduce that recording into evidence at trial. And even if any non-party

10  witnesses ultimately refuse to appear at trial, Tesla has had years to depose those witnesses and the

11  Federal Rules generally allow parties to introduce such deposition testimony at trial. *See* Fed. R.

12  Civ. P. 32(a)(4)(B), (D) (permitting use of deposition testimony if "the witness is more than 100

13  miles from the place of hearing or trial" or "the party offering the deposition could not procure the

14  witness's attendance by subpoena"). None of the retained experts in this case appear to have a

15  strong connection to either district, so this factor is neutral and does not outweigh Ms. Jackson's

16  choice of forum or the connections that this forum has to her claims.

17      In sum, the *Jones* factors provide an independent basis for denying Tesla's motion to

18  transfer. But even were it otherwise, Tesla's motion to transfer, like its disqualification motion, is

19  untimely in a manner that is both dispositive and undermines Tesla's arguments about the

20  prejudice of holding trial in California.

21      Tesla removed this case to federal court on July 28, 2022. The Court held a case

22  management conference on November 17, 2022. Prior to that conference, the parties exchanged

23  initial disclosures pursuant to Federal Rule 26(a). In her initial disclosures, Ms. Jackson disclosed

24  five individuals located in Maryland and an additional twenty-one individuals employed by Tesla,

25  many if not all of whom were in California. At the November case management conference,

26

27

28  [5] Tesla's argument that the Maryland witnesses reside outside of the Court's subpoena power is
    addressed below in considering the timeliness of Tesla's motion.

United States District Court
Northern District of California

1    counsel for Tesla assured the Court that, should Tesla choose to file a transfer motion, Tesla

2    "would do so very quickly, [so as] not … to waste any of the Court's time and resources."

3    Nonetheless, nearly twenty-six months passed before Tesla filed this motion. Although this Court

4    has yet to render any substantive merits rulings in the case, the parties have invoked the Court's

5    resources to resolve numerous discovery-related disputes.

6          Having waited over two years before filing its transfer motion, Tesla does not explain why

7    this motion is suddenly proper a mere four months before trial was scheduled to begin. Instead,

8    Tesla responds to concerns about the timeliness of this motion by arguing that it would be

9    prejudicial to hold trial in California given this Court's inability to compel trial testimony from the

10   Maryland-based driver of the vehicle that injured Ms. Jackson. *See* Fed. R. Civ. P. 45(c)(1)(A).

11   While the Court indeed lacks such power, Tesla's "protracted delay in requesting a change of

12   venue diminishes the urgency of [its] claim that [it] face[s] unfair prejudice." *Oliver v. City and*

13   *Cnty. of San Francisco*, No. C 07-2460 JL, 2009 WL 10736493, *3 (N.D. Cal. 2009). Tesla has

14   known the driver's identity and her potential importance since as early as November 2022. Indeed,

15   Tesla stated at the November 2022 case management conference that it was considering a cross-

16   complaint against the driver, which would have subjected her to the Court's subpoena power.[6]

17   Although Tesla ultimately chose not to pursue a cross-complaint, it can seek to introduce the

18   driver's deposition testimony at trial should she decline to appear. *See* Fed. R. Civ. P. 32(a)(4)(B),

19   (D). Nor is Tesla's reference at the Court's hearing on this motion to various undeposed Maryland

20   witnesses convincing. Although these witnesses may reside outside the Court's subpoena power,

21   Tesla had over nineteen months to depose them. In fact, the Court previously granted two

22   extensions to the fact discovery deadline, at least one of which the parties used to depose

23   additional Maryland witnesses. Tesla did not request a further extension.

24          Tesla also defends its delay by pointing to Ms. Jackson's initial disclosure of numerous

25   California witnesses. This argument likewise fails. Ms. Jackson's initial disclosures might have

26

27   ────────────────

     [6] At the November 2022 conference, Ms. Jackson's counsel stated that she did not intend to add
     the driver as a party. Accordingly, to the extent Tesla was unsure in November 2022 whether this
28   Court's subpoena power might ultimately extend to the driver, that was solely because Tesla itself
     had not yet finalized its decision not to file a cross-complaint against her.

made this district appear more convenient than is now apparent after the parties have completed discovery and declined to depose many of those California witnesses. But a transfer to Maryland in November 2022 would not have prevented Tesla from deposing or calling at trial many of those witnesses because, as employees of Tesla, they were subject to the Court's subpoena power regardless of their geographical location. Indeed, this district's proximity to those California witnesses may have been more convenient for Tesla during discovery. Having benefitted from that convenience for the last two years, Tesla cannot, on the verge of trial, move the matter to a district it contends will be more advantageous for the remaining proceedings.

Ultimately, it is doubtful that Tesla failed to understand the role that Maryland-based witnesses might play in its defense until shortly before the filing of its motion. Even accepting at face value Tesla's argument that in November 2022 it was "unclear early on [who] the witnesses would be," the most important witnesses were clear to Tesla by the close of fact discovery on June 30, 2024.[7] Tesla nonetheless waited an additional six months before filing this motion and arguing for the first time that trying the case in this district would be highly prejudicial to its interests.

In short, the untimeliness of Tesla's motion both undermines its arguments regarding prejudice and offers a second and independent basis to deny the motion.

Finally, transfer to the Southern District of Maryland would not serve "the interest[s] of justice[.]" 28 U.S.C. § 1404(a). When Tesla filed its motion, trial was scheduled to begin within four months. "Defendants [are generally] not … entitled to invoke the privilege to change venue at the eleventh hour before trial." *Oliver*, 2009 WL 10736493, at *3. If the case remains in this district, trial will occur in 2025—likely before summer's end. Should the Court transfer this case to the Southern District of Maryland, however, it is unlikely that trial would begin until well into 2026. Ms. Jackson and her husband are advanced in age and managing multiple complex physical

---

[7] Tesla suggests that Ms. Jackson's failure to depose certain listed witnesses before the close of discovery means that she has abandoned any contention that their testimony will be needed for trial, but this is incorrect. The primary purpose of the rule requiring parties to initially disclose those witnesses whose testimony "may … support [the disclosing party's] claims or defenses" is to permit *the other parties* to seek discovery from those witnesses, including by deposing them. Fed. R. Civ. P. 26(a)(I)(A)(i). Ms. Jackson remains free to call any properly disclosed witness at trial whether or not she chose to depose them prior to the close of fact discovery.

1    ailments. Transferring the case now would reward Tesla's dilatory tactics while prejudicing Ms.

2    Jackson's pursuit of justice.

3                                                    * * *

4        The *Jones* factors warrant dismissal of Tesla's motion. But Tesla's untimeliness in moving

5    for transfer—aside from undermining its own arguments—offers an independent basis to deny the

6    motion. Indeed, every argument that Tesla makes about the prejudice of a California trial has been

7    to Tesla known for months, if not years, and Tesla could have filed this motion in late 2022 or in

8    the summer 2024. At this late date, transferring the case will unreasonably delay trial and

9    substantively prejudice Ms. Jackson's interests. The Court therefore exercises its discretion to

10   deny Tesla's untimely motion to transfer.

11                              **TESLA'S CHOICE OF LAW MOTION**

12       Finally, Tesla asserts that there are substantive differences between California and

13   Maryland's respective products liability laws and that the Court should apply Maryland law to this

14   dispute.

15       A federal court sitting in diversity "must look to the forum state's choice of law rules to

16   determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002)

17   (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Courts in California apply

18   a three-part governmental-interest test for this purpose:

19           First, the court determines whether the relevant law of each of the
             potentially affected jurisdictions with regard to the particular issue in
20           question is the same or different. Second, if there is a difference, the
             court examines each jurisdiction's interest in the application of its
21           own law under the circumstances of the particular case to
             determine whether a true conflict exists. Third, if the court finds that
22           there is a true conflict, it carefully evaluates and compares the nature
             and strength of the interest of each jurisdiction in the application of
23           its own law 'to determine which state's interest would be more
             impaired if its policy were subordinated to the policy of the other
24           state' …, and then ultimately applies 'the law of the state whose
             interest would be the more impaired if its law were not applied.
25

26   *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. 5th 862 (2019). California courts employ dépeçage, an

27   approach that requires applying the governmental interest test to "each issue in the case[.]" *Wash.*

28   *Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th 906, 920 (2001).

United States District Court
Northern District of California

United States District Court
Northern District of California

Tesla asks the Court to apply six principles of Maryland law:

- A products-liability plaintiff must prove that the product is unreasonably dangerous.
- Strict products liability and negligence are distinct, alternative bases for liability.
- Courts apply the "consumer expectation test" unless the product malfunctions.
- Product misuse comprises part of the plaintiff's burden to prove proximate cause.
- The presence of adequate warning labels bars a products-liability plaintiff from recovery.
- Non-economic damages are capped at a statutorily defined level.

For the reasons set forth below, the Court concludes that California and Maryland law are aligned on two purported differences and that California rather than Maryland law applies with respect to the remaining differences.

### A.    Step One: California law and Maryland conflict in some respects.

Four of the six issues raised by Tesla represent a conflict of law. Two of the issues present no conflict.

**First**, both parties acknowledge that the laws of the two states differ as to whether a plaintiff must demonstrate that a product is unreasonably dangerous. *Compare Phipps v. Gen. Motors Corp.*, 278 Md. 337, 344 (1976) ("For recovery, it must be established … that [the product] was unreasonably dangerous to the user or consumer[.]"), *with Cronin v. JBE Olson Corp.*, 8 Cal. 3d 121, 133 (1972) (holding that a plaintiff need only prove that "there was a defect in the manufacture or design of the product and that such defect was a proximate cause of the injuries."). Ms. Jackson argues, however, that this is a difference without distinction because in Maryland, the failure of the automatic braking systems qualifies as one of the "kinds of conditions that, … whether resulting from a defect in design or manufacture, [are] defective and unreasonably dangerous" without the need to prove unreasonable danger. *Halliday v. Sturm, Ruger & Co., Inc.*, 368 Md. 186, 195 (2002). Examples of such inherently dangerous products include "failing brakes … and sticking accelerators." *Id.* Thus, she argues, the Model 3 is unreasonably dangerous as a matter of Maryland law.

The problem with this argument is that Ms. Jackson alleges that that the Model 3's *automatic* safety features failed, not that the brakes failed despite driver application. In fact, Ms.

United States District Court
Northern District of California

1    Jackson does not allege that the driver attempted to brake at all. Thus, it seems unlikely that

2    Maryland courts would deem the alleged defect here dangerous as a matter of law, and whether a

3    product must be unreasonably dangerous presents a material difference between the laws of the

4    two states.

5         **Second**, Tesla argues that in Maryland, unlike California, strict products liability and

6    negligence are distinct, alternative bases for liability and do not merge with one another. This is an

7    incorrect statement of the law. In California, "a plaintiff may seek recovery in a products liability

8    case either on the theory of strict liability or … negligence." *Merrill v. Navegar, Inc.*, 26 Cal. 4th

9    465, 479–80 (2001). California's negligence standard requires a plaintiff to "prove an additional

10   element," specifically that the product defect is attributable to "the negligence of the defendant."

11   *Id.* (citation omitted). Similarly, in Maryland "strict liability merely takes its place alongside

12   negligence … as an alternative basis of liability[,]" and has "no effect upon the elements necessary

13   to prove an action for negligence[.]" *Banks v. Iron Hustler Corp.*, 59 Md. App. 408, 422 (1984).

14   Thus, in both California and Maryland, strict products liability and negligence are distinct bases

15   for liability with their own respective elements. The laws of the two states do not conflict on this

16   matter.

17        **Third**, Tesla is incorrect that Ms. Jackson could only leverage the "consumer

18   expectations" test and not the "risk-utility" test under Maryland law to prove product defect. The

19   parties primarily dispute the relevance of *Kelley v. R.G. Industries, Inc.*, 304 Md. 124 (1985). In

20   *Kelley*, after suffering a gunshot wound during an armed robbery, the plaintiff sued a defendant

21   gun manufacturer on a strict liability claim, alleging that the handgun was abnormally dangerous.

22   The court stated that risk-utility test "is only applied when something goes wrong with a product."

23   *Id.* at 138. But the gun "worked precisely as intended": It "injured a person in whose direction it

24   was fired." *Id.* The plaintiff could therefore not rely on the risk-utility test.

25        Tesla argues under *Kelley* that the Model 3 worked precisely as intended: It moved forward

26   when the driver pressed down on the accelerator. But this mischaracterizes the thrust of Ms.

27   Jackson's claim. She contends that if the Model 3 had worked as intended, its automatic braking

28   systems would have activated before the collision. This sufficiently alleges for the purposes of

1    Maryland law that "the product malfunction[ed] in some way." *Halliday*, 368 Md. at 200. Thus,

2    under either state's laws, Ms. Jackson can rely on the risk-utility test to prove a product defect.

3        **Fourth**, Tesla is correct that Maryland and California allocate different burdens as to the

4    question of product misuse. In both states, the misuse of an otherwise-safe product bars a

5    plaintiff's recovery. In Maryland, "questions of misuse … are involved in the determination of

6    whether the product was defective, and whether a defect was the proximate cause of the injury."

7    *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 597 (1985). The burden to demonstrate the lack

8    of misuse thus falls on the plaintiff. By contrast, in California "product misuse [is] an affirmative

9    defense," the burden of proof for which falls on the defendant. *Chavez v. Glock*, 207 Cal. App. 4th

10   1283, 1308 (2012). This presents a material difference between Maryland and California law.

11       **Fifth**, the two states treat the presence of product warning labels differently. In Maryland,

12   "the existence of clear warnings on a product that poses a danger may also serve to bar strict

13   liability actions if certain circumstances exist." *Lightolier, LLC v. Hoon*, 387 Md. 539, 555 (2005).

14   By contrast, under California law the mere presence of a warning label does not necessarily

15   absolve a defendant of liability. *See Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987,

16   1002 (1991) ("[I]f a warning automatically precluded liability in every case, a manufacturer or

17   distributor could easily escape liability with overly broad, and thus practically useless, warnings.")

18   (citing *Finn v. G. D. Searle & Co.*, 35 Cal. 3d 691, 701 (1984)); *Springmeyer v. Ford Motor Co.*,

19   60 Cal. App. 4th 1541, 1557 (1998) (reasoning that "an adequate warning is [not] invariably a

20   sufficient defense to a strict liability action") (citation omitted). Instead, the absence of a warning

21   label provides a California products-liability plaintiff with a separate theory of liability. *See Brown

22   v. Sup. Ct.*, 44 Cal. 3d 1049, 1057 (1988) ("[Th]e third type of defect … is a product that is

23   dangerous because it lacks adequate warnings or instructions."). This is a material difference

24   between Maryland and California law.

25       **Sixth**, the parties agree that there is a material difference as to the amount of non-economic

26   damages that may be awarded in a products liability case. In California "there is no fixed or

27   absolute standard by which to compute the monetary value of emotional distress." *Pool v. City of

28   Oakland*, 42 Cal. 3d 1051, 1067 n.17 (1986). Instead, California entrusts its juries "with vast

United States District Court
Northern District of California

15

discretion in determining the amount of damages to be awarded[.]" *Bertero v. Nat'l General Corp.*, 13 Cal. 3d 43, 64 (1974). By contrast, Maryland caps noneconomic damages at $500,000 plus $15,000 for each year from October 1, 1995 onward. Md. Code Ann. Cts. & Jud. Proc. § 11-108(b)(2). In this personal injury case, this cap—which is $905,000 as of the date of this Order—would apply to any damage award related to "pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury." *Id.*

\* \* \*

For the reasons stated above, Tesla has identified four conflicts of laws. Three conflicts—unreasonable danger, product misuse, and warning labels—relate to the states' strict products liability regimes. The fourth conflict relates to the states' treatment of noneconomic damages.

### B.     Step 2: A true conflict exists.

The second step in the governmental interest test is to ask whether "a true conflict exists." *In re Miller*, 853 F.3d 508 (9th Cir. 2017) (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 112–11 (2006)). A true conflict exists where "each of the states involved has a legitimate but conflicting interest in applying its own law." *Kearney*, 39 Cal. 4th at 111. By contrast, "[w]hen one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." *Hurtado v. Sup. Ct. of Sacramento Cnty*, 11 Cal. 3d 574, 670 (1974). The Court finds that a true conflict exists as each of the differences identified above.

### 1.     A true conflict exists with respect to strict products liability law.

Both parties argue that the conflict between Maryland's and California's products liability laws is a false conflict. Tesla argues that the absence of a California plaintiff or driver negates California's interest in the case. Ms. Jackson conversely argues that Tesla's lack of a business presence in Maryland undermines Maryland's interest in the matter.

Tesla's argument that the lack of a California driver or victim precludes California's interest is misplaced for two reasons. First, Tesla's commercial activities within California implicate the state's interests. The California Supreme Court has acknowledged that "California has a strong interest in regulating the conduct of manufacturers who produce products in this state

1    which cause injury to persons in other jurisdictions." *Stangvik v. Shiley Inc.*, 54 Cal. 3d 744, 759

2    (1991) (collecting cases). California has an interest in regulating home-state manufacturers in

3    order "to deter negligent conduct; the likelihood of a substantial recovery … strengthens the

4    deterrent effect." *Id*.[8] Although the accident took place in Maryland, the activities that led to the

5    purported design defect occurred in California. Tesla designed, manufactured, and continues to

6    update the Model 3's software in California. The driver even purchased the Model 3 online from

7    Tesla in California before it was shipped out of the state. These activities are all sufficient to

8    implicate California's interests.

9         Tesla contends that California's interest in the issues presented here is hypothetical at best,

10   citing *Chen v. L.A. Truck Ctrs., LLC*, 42 Cal. App. 5th 488 (2019) (*Chen III*). *Chen III* involved a

11   fatal bus crash in Arizona. The plaintiffs, Chinese nationals, sued an Indiana bus manufacturer and

12   a California distributor in California state court. The Court of Appeal concluded that Indiana's

13   interest in "protecting [manufacturers] from excessive liability" was a "legitimate interest" given

14   the defendant's status as a "resident" of Indiana. *Id*. at 496–97. The court concluded that

15   California's interest was merely "theoretical" because "the injured persons [were] not California

16   residents and were not injured in California." *Id.* at 498.

17        Relying on this language from *Chen III*, Tesla asks the Court to conclude that California

18   lacks any interest here because neither Ms. Jackson nor the driver of vehicle that injured her were

19   California residents. But Tesla's interpretation of *Chen III* is in tension with the decision itself.

20   While Tesla focuses on the decision's discussion of the absence of a resident driver or plaintiff, it

21   ignores *Chen III*'s conclusion that the presence of a "resident defendant" implicated the legitimate

22   interest of that resident defendant's home state. *Id.* at 497. Indeed, *Chen III* reasoned at some

23   length that it would make little sense to apply the law of "the place of the tort" when that location

24

25   _____

26   [8] Tesla suggests that *Stangvik* is irrelevant because it involved *forum non conveniens* rather than
     choice of law. The California Supreme Court, however, cited multiple choice-of-law decisions in
27   asserting that California has an interest in regulating the conduct of its resident manufacturers. *See
     Stangvik*, 54 Cal. 3d at 759 (citing *Hurtado*, 11 Cal. 3d at 583–84; and *Clothesrigger, Inc. v. GTE
     Corp.*, 191 Cal. App. 3d 605, 615 (1987)). Accordingly, the Court's statement cannot be
28   interpreted as narrowly applying only to the *forum non conveniens* analysis.

"bears little connection to the products liability claims at issue." *Id.* at 500. *Chen III* concluded that Indiana had an interest in regulating its home-state manufacturers even when the tortious conduct took place in a different state and did not involve any Indiana residents. That very same analysis supports recognizing California's interest under the circumstances presented here.

Tesla's interpretation of *Chen III* ultimately proves too much. If the mere absence of a California driver or victim were dispositive of California's interests, that would mean that California's regulatory interest dissipates the minute a home-state manufacturer's products leave the state. That argument cannot be squared with the binding California Supreme Court precedent holding to the contrary. *See Stangvik*, 54 Cal. 3d at 759 ("California has a strong interest in regulating the conduct of manufacturers who produce products in this state which cause injury to persons in other jurisdictions.").

Like Tesla, Ms. Jackson argues that Maryland lacks any interest in applying its products liability law to this dispute. Her argument also goes too far because Maryland has a legitimate interest in protecting those harmed within its borders. "California choice-of law cases … continue to recognize that a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders[.]" *McCann v. Foster Wheeler, LLC*, 48 Cal. 4th 68, 97–98 (2010) (citing *Reich v. Purcell*, 67 Cal. 2d 551, 556 (1967)). Maryland's strict products liability law ensures that "a party injured by a defective and unreasonably dangerous product … [does not] bear the loss of that injury when the seller of that product … [can] take precautions and protect against the defect." *Phipps*, 278 Md. at 352–53. Strict liability serves Maryland's interest in reducing burdensome "proof … [and] procedural requirements" that arise in negligence and warranty actions. *Id.* at 353.

Although Maryland has a legitimate interest in regulating the conduct at issue here, the strength of that interest is unclear given that Maryland adopted its strict products liability approach through judicial decisions rather than legislative enactments. *See Phipps*, 278 Md. at 353. *McCann* provides an example of the kind of interest analysis that is possible where conflicts arise from statutory enactments. In that case, a California resident sued a New York manufacturer in California state court. The manufacturer had installed a large boiler at an oil refinery at the plaintiff's Oklahoma workplace and in so doing exposed the plaintiff to asbestos. The California

18

1  plaintiff sued nearly fifty years later, after he had developed mesothelioma. Oklahoma's statute of

2  repose precluded his claims, whereas California's statute of limitations did not. In concluding that

3  Oklahoma law applied, the California Supreme Court noted that Oklahoma had adopted its statute

4  of repose to extend "a measure of security for [defendants] whose liability could otherwise extend

5  indefinitely." *McCann*, 48 Cal. 4th at 91 (citation omitted). The *McCann* court reasoned that a law

6  "limiting liability for commercial activity conducted within the state" reflects that state's general

7  interest in setting the appropriate level of regulation for business entities within the state. 48 Cal.

8  4th at 91. This in turn implicated the state's interest in attracting business to generate tax revenues

9  and attract employment opportunities for its residents. *Id.*

10       The extent to which Maryland's slightly less plaintiff-friendly approach to strict products

11  liability reflects such business-minded interests is less clear given its origin in common law

12  judicial decisions. Where a state legislature adopts a law that strikes an intentional balance

13  between recovery and liability, it is reasonable for a court to presume that the legislature did so

14  with competing policy objectives in mind. Legislatures regularly consider interests like

15  "obtain[ing] tax and other revenue" and "opportunit[ies for] state residents to obtain employment."

16  *Id.* But it is not clear that such interests underlie the Maryland Supreme Court's decision, for

17  example, to place the burden of proving the absence of product misuse on the plaintiff. Although

18  Maryland has an interest in protecting plaintiffs from an injury and loss associated with a product

19  defect, it is unclear whether Maryland's strict products liability laws, to the extent they are

20  somewhat less plaintiff-friendly than California's, also reflect an interest in some broader business

21  attraction goal.

22                           \* \* \*

23       In sum, both states have an interest in applying their own laws to the dispute here.

24  California has an interest in regulating in-state businesses, while Maryland has an interest in

25  regulating in-state conduct and providing pro-consumer protections to individuals injured within

26  its borders.

27            **2.**      **A true conflict exists with respect to noneconomic damages.**

28       Both states also have an interest in applying their law on noneconomic damages to this

dispute. In California, an award of noneconomic damages must be reasonable in light of the facts of the case. Cal. Civ. Code § 3359. Courts otherwise entrust juries with "vast discretion" in awarding damages to a prevailing plaintiff. *Bertero*, 13 Cal. 3d at 63. This policy aligns with California's interests in regulating home-state industries. Damage awards that are proportional to a plaintiff's product-related injuries adequately incentivize manufacturers to design safer products. Indeed, "the likelihood of a substantial recovery … strengthens the deterrent effect." *Stangvik*, 54 Cal. 3d at 759.

Tesla argues that California has no interest in affording Ms. Jackson a recovery that she could not win were she to file in Maryland. But this misapprehends the nature of California's interest in this case. There are three purposes served by damages awards in products liability cases: "(1) compensation for [the injured plaintiff], (2) deterrence of conduct, and (3) limitation, or lack thereof, upon the damages recoverable." *Hurtado*, 11 Cal. 3d at 584. Whether or not California has an interest in ensuring that a non-resident receives full compensation for her injuries, applying California's law regarding noneconomic interests undoubtedly serves the state's interest in "deterring conduct, said interest extending to all persons present within its borders[.]" *Id.* Tesla's conduct of designing, engineering, manufacturing, and selling the Model 3 within California gives the state a clear interest in awarding damages proportional to the severity of harm to ensure adequate deterrence of future product defects.

Maryland also has an interest in capping Tesla's liability. Maryland law would cap Ms. Jackson's noneconomic recovery at $905,000. *See* Md. Code Ann. Cts. & Jud. Proc. § 11-108(b)(2). Maryland enacted section 11-108 "in response to a legislatively perceived crisis concerning the availability and cost of liability insurance[.]" *Murphy v. Edmonds*, 325 Md. 342, 368 (1992). The cap operates to "assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public." *Id.* at 369. By providing "greater ease in calculating premiums," the cap attracts insurers to the market, "reduce[s] premiums," and makes insurance "more affordable" for Maryland businesses and individuals who perform "needed services." *Id.* at 369–70.

Maryland's interest is clearly implicated here. As discussed above, the California Supreme

1  Court has held that a "state has a legitimate interest in attracting out-of-state companies to do

2  business within the state[.]" *McCann*, 48 Cal. 4th at 91. This statutory regime crystallizes

3  Maryland's interest in making low-cost liability insurance available. The availability of low-cost

4  liability insurance makes the state an attractive place to do business, particularly for companies

5  whose products can cause severe personal injuries. Contrary to Ms. Jackson's position, it is of no

6  moment that Tesla is not a Maryland resident. Although *Reich* and *Hurtado* indicated that a forum

7  has little interest in limiting the liability of a non-resident defendant, those cases "concerned

8  automobile accidents involving private individuals, not commercial entities" that may prefer to do

9  business in states in which they face lessened liability. *McCann*, 48 Cal. at 93. Maryland's interest

10  in keeping insurance premiums low necessarily extends to the state's interest in attracting new

11  businesses to the state. *See Murphy*, 325 Md. at 368. In any event, because Maryland's statute

12  does not include an "explicit indication that" it applies only "to businesses incorporated or

13  headquartered in" Maryland, "the state's interest in having that law applied" to Tesla for incidents

14  that occur within Maryland "is equal to its interest in the application" of the law to "comparable

15  activities engaged in by" resident Maryland companies. *McCann*, 48 Cal. 4th at 92.

16  * * *

17  In sum, a true conflict exists as to both the states' strict products liability law and their

18  approaches to noneconomic damages.

19  **C.      Step 3: California's interests would be more impaired if the Court applied
          Maryland law.**

20  Step three of the comparative impairment analysis requires the Court to "appl[y] the law of

21  the state whose interest would be more impaired if its law were not applied." *McCann*, 48 Cal. 4th

22  at 82." The Court must "carefully evaluate[] and compare[] the nature and strength of the interest

23  of each jurisdiction in the application of its own law." *Kearney*, 39 Cal. 4th at 108. Given the

24  "relevant interests at stake" and the "legal question at issue," the Court then decides 'which

25

26

27

28

United States District Court
Northern District of California

jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann*, 48 Cal. 4th at 97.

### 1.    Strict products liability

Although Maryland has an interest in applying its products liability law to this case, that interest is rather attenuated in the factual context presented. The facts of *McCann* provide a useful contrast. In that case, the defendant company directed its conduct to Oklahoma by "design[ing] and construct[ing] improvements to real property in Oklahoma[.]" 48 Cal. at 76. Although the defendant was not headquartered in Oklahoma, it engaged in business activity within the state's borders that exposed the plaintiff to asbestos.

In this case, however, Tesla did not engage in direct activity within Maryland that gave rise to Ms. Jackson's injury. Although the driver of the vehicle that injured Ms. Jackson picked up her car from a Maryland service center, Tesla designed, engineered, manufactured, and sold the car in California and continues to update the Model 3 from its California offices. It is arguably a fluke that the accident occurred in the Maryland portion of the Beltway rather than, for example, Washington D.C. or the Northern Virginia suburbs. Tesla could have sold this exact same vehicle to a customer in any of the fifty states. Because this case concerns an alleged defect in Tesla's product, rather than a claim of negligence against the driver, Maryland has a more attenuated connection to Ms. Jackson's product defect claims than it might have in other cases.

Further, Maryland courts adhere to the *lex loci deliciti* doctrine when deciding choice of law issues. That doctrine provides that "when an accident occurs in another state[, the] substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 745 (2000). Although this rule does not entirely negate Maryland's interest here, it does suggest that Ms. Jackson's Maryland residency implicates Maryland's interests to only a limited degree. Had the same accident occurred in Northern Virginia, for example, Maryland courts would disregard her residency entirely and instead apply Virginia law.

In addition, applying California's law to this dispute will not significantly impair the interest underlying Maryland's products liability laws, which is to protect individuals from

22

1  "bear[ing] the loss of [her] injury when the seller of that product … [can] take precautions and

2  protect against the defect." *Phipps*, 278 Md. at 352–53. Maryland adopted its strict products

3  liability regime primarily to provide plaintiffs with a less burdensome avenue for recovery. Before

4  that time, Maryland products-liability plaintiffs could only pursue negligence or breach of

5  warranty claims, *see Phipps*, 278 Md. at 346–53 (1976), and Maryland's shift to strict products

6  liability was intended to be "an important pro-consumer advance[,] relieving persons injured by

7  products from the requirement of proving *negligence* on the part of manufacturers[.]" *Halliday*,

8  368 Md. at 201 (emphasis added).

9      In this case, California law, like Maryland law, allows Ms. Jackson to bring a strict

10  products liability claim. As a result, the primary state interest underlying Maryland's strict

11  products liability laws would not be impaired in any way through application of California law.

12  Indeed, California places fewer burdens on products liability plaintiffs than Maryland.

13      For all of these reasons, Maryland's interests would be impaired only minimally by

14  applying California law to this case. By contrast, applying Maryland's products liability law

15  would substantially undermine California's interest in deterring tortious conduct within its borders

16  that causes subsequent injury beyond its borders. Although both states allow plaintiffs to recover

17  under a strict products liability theory, California allocates its burdens and defenses differently.

18  For example, in California the presence of a warning label will not necessarily absolve Tesla of

19  liability. In other words, California requires manufacturers to do more to make their products safe

20  than simply add a warning label. Conversely, under Maryland law Tesla might escape all liability

21  if the jury were to deem the warning labels on its vehicles adequate. This would drastically

22  undercut California's ability to assure users of California products that those products are

23  reasonably safe whether or not they have a warning label. *Cf. McCann*, 48 Cal. 4th at 98. And

24  because Tesla has "no way of knowing or controlling where" its customers drive their vehicles "in

25  the future, subjecting such a defendant to a different rule of law based upon the law of a state to

26  which" a customer drives their Model 3 would create a regulatory patchwork. *Id.* This "would

27  significantly undermine [California's] interest in establishing a reliable rule of law" to regulate the

28  safety of products manufactured within its borders. *Id.*

United States District Court
Northern District of California

1   Because California's regulatory interests would be significantly impaired were the Court to

2   apply Maryland law, and given the limited impairment of Maryland's interests resulting from the

3   application of California law to this dispute, California has the greater interest in having its strict

4   products liabilities laws applied in this case. California law thus applies on these issues.

5                   **2.      Noneconomic damages**

6           Similarly, while Maryland has an interest in applying its cap on noneconomic damages to

7   this dispute, applying California law in this case would not seriously undermine that interest. As

8   noted already, the primary purpose of Maryland's cap is to help maintain a market for affordable

9   liability insurance, which serves Maryland's interest in establishing itself as an attractive location

10  for companies to do business. *See Murphy*, 325 Md. at 369. Tesla, however, does not carry

11  insurance that would cover any of the claims at issue, meaning that no Maryland-based insurer

12  would be responsible for paying a jury award, which in turn suggests that a jury award exceeding

13  the cap is unlikely to influence insurance costs within Maryland. And to the extent that the cap

14  reflects a broader interest in attracting businesses to Maryland, that interest is only minimally

15  implicated under the facts of this case given that Tesla sold the Model 3 at issue from California

16  via the internet and transferred it to the owner via a New York dealer. Given that Tesla continues

17  to sell its vehicles in states like California that do not impose any cap whatsoever on non-

18  economic damages, Tesla cannot credibly contend that it will cease selling vehicles to individuals

19  in Maryland if courts fail to apply its cap on non-economic damages under circumstances like

20  those presented here. Application of California's law is therefore unlikely to significantly

21  undermine Maryland's interest in structuring its markets to recruit and retain businesses within the

22  state.

23          California's interests, however, would be impaired by the application of Maryland law.

24  California furthers its interest in deterring negligent product design by allowing juries to award

25  damages that are proportional to the harm caused by a defendant's defective product. Proportional

26  jury awards compel liable manufacturers to internalize the full costs of their products' designs and,

27  in turn, take steps to prevent similar harm in the future. But applying Maryland's cap on damages

28  involving "pain, suffering, inconvenience, physical impairment, disfigurement, [and] loss of

24

1  consortium," Md. Code Ann. Cts. & Jud. Proc. § 11-108(b)(2), to this case could shield Tesla from

2  a proportional award given that many of these categories of harm are implicated by Ms. Jackson's

3  claims. By shielding Tesla from such an award, this cap would weaken the financial deterrent

4  effect of that award and make it less likely that Tesla will take steps to protect future consumers

5  from the type of harm that Ms. Jackson suffered.

6          Accordingly, California's regulatory interests would be significantly impaired were the

7  Court to apply Maryland's law capping noneconomic damages to this dispute. Because this

8  impairment outweighs any impairment of Maryland's interests resulting from the application of

9  California law, the Court will apply California's law regarding noneconomic damages to this case.

10                                   **CONCLUSION**

11         For the foregoing reasons, Tesla's motions to dismiss, transfer, and apply Maryland law

12 are denied.

13         **IT IS SO ORDERED.**

14 Dated: March 25, 2025

15

16

17                                                    P. Casey Pitts
                                                     United States District Judge
18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California